MARGARET J. SAVAGE, as Mother and Next Friend of Jeanette M. Savage, Plaintiff-Appellant, v. JAMES MARTIN, Defendant-Appellee.

First District (1st Division) No. 1—90—2827

Opinion filed December 6, 1993.

Leonard M. Ring & Associates, P.C., of Chicago (Leonard M. Ring, Debra A. Thomas, and Leslie J. Rosen, of counsel), for appellant.

Williams & Montgomery, Ltd., of Chicago (James K. Horstman, Barry L. Kroll, Kevin Campbell, and Lloyd E. Williams, Jr., of counsel), for appellee.

PRESIDING JUSTICE MANNING delivered the opinion of the court:

This is an appeal by plaintiff, as mother and next friend of Jeanette M. Savage, from a jury verdict entered in favor of her 10-year-old daughter, Jeanette M. Savage, and an assessment of Jeanette's contributory negligence at 63%. Plaintiff brought a negligence action against defendant James Martin for injuries Jeanette sustained when her bicycle collided with defendant's vehicle. At the close of evidence, the court entered a directed verdict on the issue of Jeanette's contributory negligence. The jury then returned a verdict in favor of Jeanette and against Martin for $80,000, and determined that Jeanette's contributory negligence accounted for 63% of the fault.

Plaintiff appeals (1) the court's ruling that Jeanette, 10 years old at the time, was contributorily negligent as a matter of law, (2) evidentiary rulings, and (3) rulings related to the submission of certain jury instructions. For the reasons which follow, we reverse and remand.

About 2 p.m. on June 13, 1982, Jeanette Savage and her friend Sandra Kane rode their bicycles from Jeanette's home in Chicago headed for Candy Cane Park. Jeanette's home was two houses south of 103rd Street on the east side of California Avenue. The accident occurred at the intersection of 103rd Street, an east-west street with four lanes, and California Avenue, a north-south street with two traffic lanes. Several persons testified to the occurrence.

Donnette Bruno testified that she was traveling westbound on 103rd Street and stopped at Washtenaw Avenue. Defendant's vehicle pulled alongside her vehicle in the left lane. When the light turned green, defendant accelerated, screeching his car wheels. Bruno was able to see two girls as she looked westbound on 103rd Street from Washtenaw, which was about two blocks from California. She

testified that the girls were standing on the southwest corner of California at 103rd Street. She stated that the traffic light governing 103rd Street had turned from yellow and was turning red. Defendant's vehicle at that time was about one block ahead of her vehicle. Bruno testified that defendant's vehicle was close to the intersection when the girls started to cross.

Bruno stated that the two girls were looking across the street with their heads up. She did not see the light when the girls started crossing and could not tell whether they were in the crosswalk and did not remember whether the girls looked to see if there was any traffic coming. However, she did see the orange "Don't walk" light reflecting on the hood of the traffic light. She testified that the girls then started across the street with their bicycles and defendant's vehicle hit one of them and swerved, throwing the girl from the vehicle. Bruno stated that she looked at the light at 103rd Street and it was red. She left the scene, then drove back where she saw the victim lying on the curb.

Bruno's in-court testimony conflicted with her deposition testimony. During her deposition she stated that she did not know what color the light was at 103rd because she was looking at the girls. She also testified during her deposition that the girls placed their heads down and started to walk across the street. On cross-examination she stated that Jeanette glanced westbound on 103rd Street to see if there was traffic coming up the hill and then looked straight.

Sandra Kane testified that about 2 p.m. on June 13, 1982, she and Jeanette were on their way to Candy Cane Park riding their bicycles. They crossed California Avenue and stopped at the southwest corner to cross 103rd Street. The light governing 103rd Street at that time was green. Jeanette stood by Sandra on her bicycle with her feet on the ground. Sandra stated that she stayed on the southwest corner of California and watched the light that governed California and that light was red. Jeanette watched the light that governed 103rd Street which overhung on the eastbound lane of 103rd Street. She stated that when Jeanette stepped off the curb, the light governing eastbound traffic turned from green to yellow. Sandra did not recall in which direction Jeanette looked before stepping off the curb. Sandra testified that Jeanette started slowly pedaling and was about midway across the eastbound lanes when the light for California turned green. She stated that Jeanette was outside the crosswalk when she began to cross the street, and that Jeanette turned the bicycle west along the curb and was hit by defendant's vehicle. Sandra testified that she did not see defendant's vehicle before

it hit Jeanette and that defendant applied his brakes, turned east and ended several feet west of the crosswalk. Sandra testified she did not know what color the light was for westbound traffic on 103rd Street when defendant's vehicle entered the intersection.

In her deposition testimony, Sandra testified that she did not see Jeanette look for traffic in either direction on 103rd Street before she crossed the eastbound lanes. However, at trial she stated that she did not remember making that statement. On cross-examination she stated that Jeanette glanced west to see if there was any traffic coming up the hill, then looked straight. She also testified that Jeanette's bicycle came into contact with defendant's vehicle, and that she did not know what color the light was when defendant's vehicle entered the intersection.

Margaret Savage, Jeanette's mother, testified that on the afternoon of the incident her daughter and a girl friend were riding their bicycles. She heard an impact and screeching tires then ran to the site of the accident at 103rd Street. Margaret saw Jeanette lying on the street with blood coming from a wound. Margaret asked Jeanette various questions which she did not respond to. A pediatrician came to the scene and assisted Jeanette by applying pressure to the head wound. Margaret stated that the ambulance arrived about 20 minutes later.

Margaret stated that she saw defendant and a passenger at the scene. Defendant's car was facing east, and skid marks were on the street. Margaret testified that Jeanette was taken to Little Company of Mary Hospital. She suffered abrasions on her feet, hands, arms and legs. She had a scalp wound and her hair was filled with blood. Jeanette was placed on a respirator and hospitalized for six days. After her release from the hospital, Jeanette experienced periods of dizziness and headaches. Her neurosurgeon, Dr. Amine, limited her swimming, biking, and roller skating for six months. She gradually returned to her normal activities.

In 1983, Margaret took Jeanette to Drs. Brophy and Andricauco for problems related to her head. Margaret stated that Jeanette was having headaches, sleeping long periods and having behavioral problems. Emotionally she would seem to get out of control. Dr. Brophy referred Jeanette to Dr. Huttenlocher, who conducted a neurological examination, ordered an EEG and a brain wave examination. Dr. Brophy advised Margaret that the results of Dr. Huttenlocher's exams were normal.

In 1986, Dr. Speigel also examined Jeanette at the request of defendant's attorney. Speigel conducted a neurological examination also. He did not treat Jeanette for her symptoms nor did he conduct

any further examinations. Jeanette continued to experience problems and was admitted to Christ Hospital in 1987. She was examined by Dr. Egel overnight at the hospital, but did not receive any treatment.

Margaret testified that Jeanette's grades in school tended to be erratic, she did not go out on evenings or weekends with her friends, and continued to experience tiredness and headaches.

In 1989 Margaret took Jeanette to see Dr. Hirsch for her complaints related to her head and her behavior. Dr. Hirsch reviewed Jeanette's medical history and conducted several tests. He recommended medicine, but because plaintiff felt Jeanette was making progress, she did not want her to take medicine because of the side effects. Margaret testified that before the accident Jeanette was a healthy 10-year-old who enjoyed playing with friends.

James Martin testified that about 2 p.m. on June 13, 1982, he left his home and drove down Talman Street headed toward 103rd Street. It was clear and sunny outside, and he turned west on 103rd Street. He drove to Washtenaw and 103rd, where he stopped for a red light. Martin could see the intersection of 103rd Street and California from Washtenaw. He testified that he saw children at the intersection of 103rd Street and California as he drove away.

Martin stated that the two girls he saw were on the median strip. One girl had a bicycle underneath her and the other had the bicycle at her side. He stated that they may have looked at him. Martin testified that he never took his eyes off the girls, and when he was about 15 feet away, one girl moved from the median strip. He stated that he was traveling about 20 miles per hour. As he approached the intersection of 103rd Street westbound at California, the light was green and remained green as he entered the intersection. Martin testified that as he was coming through the intersection and crossing the crosswalk, Jeanette was standing still. Martin slammed on his brakes and turned the wheels to the right. Jeanette's bike then struck the front of his car and her head hit the windshield. Martin testified that he did not recall whether or not he looked to see if his car left any skid marks, although in his deposition testimony he stated that he looked and did not see any skid marks.

Before Dr. Speigel testified, defense counsel filed a motion *in limine* to restrict his testimony regarding any opinion that he held regarding epileptic seizures Jeanette experienced that were not contained in his 1986 deposition. Plaintiff's counsel explained that Dr. Speigel had, at the time of the deposition, formulated an opinion regarding Jeanette's likelihood of experiencing seizure activity, but that defense counsel never asked a question about that issue. Defense counsel advised the court that Dr. Speigel was asked during his depo-

sition whether all of his opinions were contained in the deposition report of May 1986 and Dr. Speigel replied that they were. The court barred Dr. Speigel from rendering a new opinion which did not comply with the provisions of Rule 220 (134 Ill. 2d R. 220). The court explained that Dr. Speigel was responsible for timely updating opinions that he developed subsequent to the time of his deposition testimony to provide opposing counsel the opportunity to determine whether or not another deposition should be taken. The court, however, did allow plaintiff to make an offer of proof as to Dr. Speigel's opinion. At the conclusion of that offer, the court sustained its ruling.

Dr. Speigel testified that at the request of plaintiff's counsel, in May 1986 he reviewed the medical history of Jeanette, performed a physical examination, and determined that she had sustained multiple contusions and abrasions. He determined that Jeanette had a sudden respiratory arrest in 1982, that she was placed on a respirator and admitted to Little Company of Mary Hospital. He stated that Jeanette was transferred from that hospital to another hospital in Palos Heights and about one hour after her arrival she had an epileptic seizure, became comatose and subsequently lethargic. The medical records showed that Jeanette was discharged on June 18, 1982. She had a scalp laceration which became infected and received follow-up treatment for the infection.

Dr. Speigel also reviewed Jeanette's 1987 admissions records from Christ Community Hospital. He testified that after reviewing those records, he personally sent her for an additional EEG in 1988 and that the results of that test were normal. He also performed a neurological exam, examined her motor system, her sensory system, the reflexes, the vestibular and cerebullar system and all were normal. He stated that Jeanette told him that she had a hard time sleeping and experienced anxiety, and often became very nervous. She also stated that she felt dizziness and experienced headaches, but that the headaches had improved. Dr. Speigel reached a diagnosis based on the review of Jeanette's medical records and symptoms she presented that she had post-concussional syndrome as a result of the cerebral concussion. He opined that the problem was a result of the injury she sustained in 1982.

Dr. Speigel did not know whether Jeanette's problems would continue in the future or if they would terminate completely. He did not prescribe or recommend any treatment for her after the examination.

Robert Savage, Jeanette's father, testified that on June 13, 1982, he was at home working in the yard when he heard a loud screech of

car brakes. He walked to the front yard and down the street, where he saw his daughter lying in the street. Robert stated that he noticed skid marks and an automobile facing the wrong direction on eastbound 103rd Street. Robert testified that he talked with Donnette Bruno at the scene and she gave him her business card. He later visited his daughter at the hospital.

Jeanette was in elementary school at the time of her injury. Robert testified that after the accident Jeanette slept more. When Jeanette began high school, she was a "C" student and received criticism that she needed to improve her poor test scores. In her junior year she was in the bottom 25% of her class. She did not receive major criticism in her senior year. Robert attributed the problems to the accident that Jeanette suffered while in elementary school.

Robert stated that he first gave Jeanette permission to cross 103rd about 15 months before the accident when she was $8^1/2$ years of age. He told her to be careful crossing and make sure to read the lights correctly and watch for turning traffic.

Jeanette Savage, $17^1/2$ years of age at the time of trial, stated that she participated in sports while in high school. She testified that she enjoyed jogging and bike riding. On the day of the accident, she left her home with Sandra and they traveled west across California riding their bikes. She stated that she had her feet on the ground sitting on her bike at the southwest corner of 103rd Street waiting for the light to change. At that time, the light for California was red. Jeanette stated that she was looking at the overhead light for 103rd Street that faced the direction of eastbound traffic. The overhead light turned yellow, but had not turned red when she looked to her left. She stated that the eastbound traffic was beginning to stop as she stepped off of the curb and started to ride her bike. Jeanette testified that she went about two feet and did not remember anything after that.

On cross-examination Jeanette stated that she did not remember looking to her right and seeing westbound traffic, nor did she see defendant's car prior to the accident.

Jack Teel was an occurrence witness. He testified that he was traveling eastbound on 103rd when he observed two girls about to enter the intersection. He stated that one girl remained on the corner of the street, and the other girl walked out. He stated that he heard a noise, looked up and the girl was colliding with a car. The car was westbound on 103rd Street and the girl was about 20 to 30 feet out of the crosswalk. He testified that the traffic control signal for 103rd Street was green and that the car traveling westbound was going about 20 miles per hour. Teel stated that he turned his car around,

parked and then went to offer assistance. He stated that right after the collision the light was still green. The car involved in the accident was partially turned around facing a northwardly direction toward the curb. Teel did not actually see the collision.

Dr. Hughes, a professor of neurology and director of the EEG department at the University of Illinois Medical Center, testified that an EEG was performed on Jeanette in May 1984 at Little Company of Mary Hospital. He determined that Jeanette was perfectly normal. He stated that the tests did not establish anything abnormal about Jeanette. There was no evidence whatsoever of any physical damage to the brain.

Dr. Hughes testified that he primarily handled patients with epilepsy. He stated that the history of a patient is the crucial feature in diagnosing epilepsy. He stated that confirmation of epilepsy is only by one means and that is the EEG. He stated that he found Jeanette's records easy to read and spent a number of hours reviewing them. He stated that people suffering from epileptic seizure activity, in 5% of the cases, will have perfectly normal EEG's. Based on his review of the medical records for Jeanette, he stated that the records called it a seizure, but that it was very hard to determine because there was so little description contained in the report. The only description given that indicated a seizure had occurred was mouth and eye twitch. He stated that when the EEG test was performed on Jeanette she was asleep for all three tests. Hughes stated that the EEG would show organic changes in the brain.

Hughes never examined Jeanette because Dr. Huttenlocher conducted two normal examinations. Huttenlocher had not seen any evidence that Jeanette had any type of seizure activity. In his opinion she would not experience seizure activity in the future. Hughes also stated that Dr. Hirsch in his discovery deposition testified that in his opinion as an expert Jeanette would not have seizures in the future.

Raymond Demich was another occurrence witness. He testified that on June 13, 1982, he witnessed an accident that took place at the intersection of 103rd Street and California Avenue. He was driving south on California and was the first car stopped at a traffic signal at 103rd Street. He was preparing to make a turn to head westbound on 103rd Street. He observed two girls on bikes in the area. The girls were crossing California from the southeast corner going to the southwest corner. As the girls crossed California the light was red. When they arrived at the southwest corner of the intersection, the girls started crossing 103rd Street to go from the southwest corner to the north side of the street. As the girls began crossing 103rd Street, the light for California was red. One girl

walked her bike and the other girl rode her bike with her head looking down toward the street. He did not observe the girl who rode her bike look in either direction to see if traffic was coming, but the second girl looked both ways. The two girls reached the median strip and began to cross 103rd Street. They were not inside the crosswalk. The girl walking her bike stopped and screamed as the girl riding the bike kept going and ran into defendant's car. Demich stated that he was in front of the car involved in the accident and observed the car go through the intersection. He stated that the light for southbound California was red as the vehicle traveling westbound on 103rd Street went through the intersection.

On cross-examination Demich stated that he could see the light that governed the girls on the south side of 103rd Street, but he could not see the one that faced them from the north side. He stated that the south side light was red. Demich stated that the girl who walked her bike looked in his direction but that the girl who rode on the bike did not.

At the close of evidence, the defendant moved for a directed verdict as to Jeanette's comparative negligence. The court heard argument on the motion. The court granted defendant's motion and instructed the jury that it had found plaintiff before and after the time of the occurrence contributorily negligent as a matter of law. The jury was then instructed to determine the percentage of fault attributable to Jeanette, which it found to be 63%. The jury returned a verdict of $80,000. Plaintiff appeals this judgment.

Plaintiff first argues that the trial court erred in granting a directed verdict in favor of defendant on the issue of contributory negligence. She maintains that plaintiff's conduct was not so palpably unreasonable, as a matter of law, such that a directed verdict should have been entered. She asserts that, in light of the contradictory testimony of the witnesses, the minor's age, and surrounding circumstances, the evidence was not so overwhelmingly in favor of defendant that a contrary verdict could never stand.

■ Whether plaintiff is "guilty" of contributory negligence is always a question for the jury unless "it is established from the undisputed facts that all reasonable minds, in the exercise of fair and earnest judgment, would reach the same conclusion that the plaintiff was contributorily negligent." (*Doris v. Bradley* (1979), 76 Ill. App. 3d 890, 892-93, 395 N.E.2d 636.) The standard for determining contributory negligence as a matter of law on a motion for directed verdict is whether all the evidence, when viewed in its aspects most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. (*Wright v.*

*Yellow Cab Co.* (1983), 116 Ill. App. 3d 242, 451 N.E.2d 1313.) Therefore, where the evidence demonstrates a substantial factual dispute, or where the assessment of the credibility of witnesses or determination regarding conflicting evidence may be decisive of the outcome, it is error to direct a verdict. *Sloan v. O'Dell* (1987), 159 Ill. App. 3d 268, 272, 512 N.E.2d 105.

Additionally, where a minor plaintiff between the ages of 7 and 14 is involved, the trier of fact must also take into consideration "the age, capacity, intelligence, and experience of the child" in light of the rebuttable presumption that a child between the ages of 7 and 14 is not capable of contributory negligence. (*Hardy v. Smith* (1978), 61 Ill. App. 3d 441, 378 N.E.2d 604.) Further, a court must engage in a two-prong inquiry when determining whether a plaintiff is contributorily negligent: first, the court must find that plaintiff was negligent in that she "failed to exercise ordinary care for her own safety" (*Chaplin v. Geiser* (1979), 79 Ill. App. 3d 435, 439, 398 N.E.2d 628); and second, the court must conclude that plaintiff's negligence was a proximate cause of her injury (*Healy v. Bearco Management, Inc.* (1991), 216 Ill. App. 3d 945, 576 N.E.2d 1195, *appeal denied* (1991), 142 Ill. 2d 654).

Here, the record reveals that Jeanette was 10 years old at the time of the incident. She observed the eastbound traffic on 103rd Street begin to slow down before she rode her bicycle across the street. Jeanette testified that at the time she began riding her bicycle across 103rd Street the traffic signal for eastbound 103rd had turned yellow, but had not yet turned red. Jeanette crossed both lanes of eastbound 103rd Street and the median strip when she began to curve her bicycle westbound as she struck defendant's vehicle. Donnette Bruno testified that she was travelling west on 103rd Street at the time of the incident and that the light for westbound traffic on 103rd was red when Jeanette was hit. Sandra Kane testified that although she did not know what the light was when defendant's vehicle entered the intersection, the light for California turned green when Jeanette was midway across the eastbound lanes.

There was contradictory evidence provided by defendant, Jack Teel, and Raymond Demich. Defendant testified that the light for 103rd Street was green when he entered the intersection at California and 103rd Street. Jack Teel testified that he was driving east on 103rd Street, and although he did not actually see the accident, he heard a noise, looked up and realized that a girl had collided with a westbound vehicle. Teel stated that he noticed that the light was green for 103rd Street. Raymond Demich testified that he was driving south on California, that the signal for southbound traffic on Califor-

nia was red as defendant's vehicle went through the intersection on 103rd Street.

The undisputed facts in this case are that plaintiff rode her bicycle across eastbound 103rd Street while the light governing that lane was yellow and that she was struck by a westbound vehicle driven by defendant. There is disputed testimony, however, as to whether the traffic signal governing westbound 103rd Street was red at the time defendant drove through the intersection. The testimony of Bruno and Kane supports the inference that the light was red for westbound 103rd Street when defendant drove through the intersection and struck plaintiff. The testimony of Teel and defendant supports the conclusion that the light was green for 103rd Street when defendant entered the intersection. It is the jury's job to assess the credibility of witnesses and resolve conflicts in the evidence and, therefore, it is improper to direct a verdict when there are facts in dispute. *Beeler v. Chem-Lawn Corp.* (1989), 183 Ill. App. 3d 648, 539 N.E.2d 290.

In *Beeler*, plaintiff sought to recover for personal injuries incurred as a result of a collision between a truck driven by defendant employee and a bicycle ridden by plaintiff. Plaintiff testified at trial that she had no recollection of the occurrence at all. The only direct evidence of the collision between plaintiff and defendant was the testimony of defendant's agent, Mr. Hardy. At the close of the evidence, plaintiff moved for a directed verdict—which the trial court denied on the basis that it was precluded from doing so because there were questions of fact. Plaintiff later renewed that motion, and the trial court entered directed verdicts determining that plaintiff was not contributorily negligent and that defendant was negligent as a matter of law. The trial court's findings were made despite the fact that there was conflicting testimony as to the point of impact, the speed of travel and the exercise of due care of the plaintiff.

On appeal the appellate court held that, based on the evidence presented at trial, the issue of plaintiff's contributory negligence was a question that should have been decided by the jury, irrespective of any statutory violation. *Beeler*, 183 Ill. App. 3d at 654.

■ In the instant case, the trial court likewise reached its conclusion that plaintiff was contributorily negligent in the face of contradictory evidence. In *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, the Illinois Supreme Court held that verdicts ought to be directed and judgment entered only in those cases in which all the evidence, when viewed in the aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. Further,

where a minor child is involved, a directed verdict on the issue of contributory negligence is proper where the child's conduct is determined to be palpably unreasonable. *Kennedy v. Kiss* (1980), 89 Ill. App. 3d 890, 412 N.E.2d 624.

In reviewing the evidence in the light most favorable to plaintiff, a jury could conclude that by the time plaintiff crossed over the eastbound lanes of 103rd and the median and reached the westbound lanes, the signal for westbound traffic had turned red. Thus, her act of riding in front of eastbound traffic when the light was yellow may have been negligent, but not a proximate cause of her being struck by a westbound vehicle. This is true in spite of the fact that plaintiff was outside the crosswalk when she was struck by defendant's vehicle. Had plaintiff been within the crosswalk at the time defendant's vehicle drove through a red light, the vehicle may still have struck her. A jury could therefore conclude that defendant's vehicle was speeding through a red light when plaintiff was struck. Consequently, her negligent acts of crossing on a yellow light and crossing outside of the crosswalk would not have been a proximate cause of her injury.

Where the evidence demonstrates a factual dispute, or where resolution of conflicting evidence may determine that outcome, it is error for the trial court to direct a verdict. (*Roeseke v. Pryor* (1987), 152 Ill. App. 3d 771, 777, 504 N.E.2d 927.) A plaintiff is guilty of contributory negligence when she fails to exercise that degree of care which a reasonably prudent person would have used for her own safety under like conditions, and that failure is the proximate cause of her injury. (*Healy v. Bearco Management, Inc.* (1991), 216 Ill. App. 3d 945, 576 N.E.2d 1195.) A child between the ages of 7 and 14 is presumed to be incapable of contributory negligence. (*Hardy v. Smith* (1978), 61 Ill. App. 3d 441, 378 N.E.2d 604.) Therefore, considering the plaintiff's age, the conflicting testimony presented and the lack of overwhelming evidence in favor of defendant, we find that the trial court erred by entering a directed verdict in favor of defendant on the issue of plaintiff's contributory negligence.

Plaintiff next argues that the trial court erred by striking certain claims from her jury instructions. She argues that the court failed to instruct the jury on all of the issues that were raised by the evidence. Specifically, plaintiff asserts that the testimony in this case supported the issue that defendant drove his vehicle at an excessive rate of speed and that he failed to keep his vehicle under control, failed to take evasive action and failed to obey traffic control signals.

A party has the right to have the jury instructed on his theory of the case, and the court must instruct the jury on all issues which it finds have been raised by the evidence presented. (*Rios v. Navistar*

*International Transportation Corp.* (1990), 200 Ill. App. 3d 526, 558 N.E.2d 252, *appeal denied* (1990), 133 Ill. 2d 572.) However, reversible error occurs when the court instructs the jury on an issue that is unsupported by the evidence. *Yedor v. Centre Properties, Inc.* (1988), 173 Ill. App. 3d 132, 527 N.E.2d 414.

Here, the court struck paragraphs (a), (d), (e) and (f) of plaintiff's issues instructions. Paragraph (a) of the instructions alleged that the defendant was negligent in that he operated his car at an excessive rate of speed. Plaintiff contends that defendant admitted he saw Jeanette a few blocks away and yet he was unable to avoid the collision. She maintains that this fact raised an issue as to whether defendant was driving at an excessive rate of speed and that the jury should have been issued a jury instruction as to that issue. Plaintiff cites *Figarelli v. Ihde* (1976), 39 Ill. App. 3d 1023, 351 N.E.2d 624, for the proposition that a person can be driving under the speed limit and still be driving too fast for existing conditions. Further, plaintiff asserts that Bruno testified defendant's car screeched as it drove from the stop light at Washtenaw, that Sandra and Jeanette testified that they never saw defendant until he was in the intersection, and that Sandra testified the light for California had turned green before Jeanette reached the median.

■ Although we find the instant case distinguishable from *Figarelli*, there was testimony to support an inference that defendant drove at an excessive rate of speed. The testimony of Bruno was that defendant's vehicle drove away at a high rate of speed one block before it reached the intersection of California. Further, the testimony of both Kane and Bruno support the inference that the traffic signal for westbound 103rd Street was red at the time defendant's vehicle entered the intersection, and that defendant could have been speeding when he entered the intersection and failed to reduce his speed to avoid a collision.

As to paragraphs (d), (e) and (f), plaintiff argued that defendant failed to keep his car under control, failed to take evasive action and failed to obey traffic control signals. Again, there is evidence in the record to support the inference that defendant failed to obey traffic signals. This evidence, although conflicting, was before the court and the jury should have been issued an instruction as to that evidence.

The true test is whether the instructions given, taken together, fully and fairly apprise the jury of the relevant principles. (*Bass v. Washington-Kinney Co.* (1983), 119 Ill. App. 3d 713, 457 N.E.2d 85.) We find that the court's limitation of the instructions did not fairly apprise the jury of the relevant issues. This is particularly true in light of the fact that the court improperly granted a directed verdict

on the issue of contributory negligence. Therefore, we find that the court erred in striking the above issues instructions.

Plaintiff's final contention is that the trial court improperly barred Dr. Speigel from testifying that Jeanette suffered from seizures as a result of the accident. Before trial, defendant filed a motion *in limine* to bar Dr. Speigel's testimony as to any seizure disorder that Jeanette suffered. At Dr. Speigel's discovery deposition taken in 1987, he was specifically asked whether he had any other opinions in addition to those contained in his medical report dated May 13, 1986. Speigel stated that he had no other opinions than those that he had disclosed. However, during trial Dr. Speigel attempted to give an opinion that Jeanette suffered from epilepsy. During a side bar the court asked whether this was a new opinion or one that Dr. Speigel held earlier. Speigel testified that it was an opinion that he held during the initial deposition, but that defendant's counsel had not inquired as to that issue. The court held that under Supreme Court Rule 220 (134 Ill. 2d R. 220), plaintiff had an obligation to advise defendant of any further opinions that he developed so that counsel could make a decision as to whether he wanted to take another deposition. The court granted defendant's motion, but allowed plaintiff to make an offer of proof. Plaintiff made that offer, and the court sustained the motion *in limine*.

■ The trial court's imposition of sanctions for violations of discovery rules is a matter for the sound discretion of the trial court and will not be disturbed absent a showing of an abuse of that discretion. (*Kosinski v. Inland Steel Co.* (1989), 192 Ill. App. 3d 1017, 549 N.E.2d 784.) Here, the court acknowledged that the imposition of a sanction barring Dr. Speigel's testimony was a harsh remedy; however, the court determined that pursuant to case law, there was no other real remedy available. The court explained that Dr. Speigel could not render opinions, that, in its view, were new opinions, and where the expert had not followed the provision of Rule 220 by alerting the opposing side to this information. We cannot say that the court abused its discretion in barring Dr. Speigel's testimony based on Supreme Court Rule 220.

■ In light of the fact that we have found error only as it relates solely to the extent of each party's negligence, we reverse and remand this cause for trial only as to the liability issue. While plaintiff's prayer for relief seeks the alternative of either a new trial for liability or on all issues, we see no necessity for any further consideration of the assessment of damages. *Lundy v. Whiting Corp.* (1981), 93 Ill. App. 3d 244, 259, 417 N.E.2d 154.

For the above reasons, that portion of the trial court judgment

granting damages is affirmed. That portion of the trial court judgment granting a directed verdict on the issue of contributory negligence is reversed and remanded.

Affirmed in part and reversed and remanded in part.

BUCKLEY and O'CONNOR, JJ., concur.