2020 IL App (1st) 182190-U

No. 1-18-2190

FIRST DIVISION
July 20, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| LAURA CAMACHO and ALEX CAMACHO, | ) | Appeal from the Circuit Court of |
| | ) | Cook County, Law Division. |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 15 L 11333 |
| | ) | |
| JOSEPH BINDER and CHICAGOLAND | ) | |
| FINISHING MATERIALS, INC., | ) | Honorable |
| | ) | Clare E. McWilliams, |
| Defendants-Appellees. | ) | Judge Presiding. |

PRESIDING JUSTICE GRIFFIN delivered the judgment of the court.
Justices Hyman and Pierce concurred in the judgment.

**ORDER**

¶ 1    *Held*:   In a rear-end car accident case, the trial court did not err when it denied plaintiffs' motion *in limine* in part, allowed defendants to introduce into evidence the injured passenger's Facebook posts, removed a juror mid-trial, refused to enter a directed verdict on negligence, and rejected plaintiffs' request for a new trial.

¶ 2    Defendant Joseph Binder rear-ended a car occupied by plaintiffs Laura Camacho (Laura) and Alex Camacho (Alex). Laura was in the passenger seat and left the scene in an ambulance. Plaintiffs sued defendant and his employer, Chicagoland Finishing Material, Inc. (CFM), in the Circuit Court of Cook County. Laura claimed defendant's negligent and willful and wanton

conduct caused her to suffer neck injuries. Alex sought damages for loss of consortium. Both plaintiffs claimed CFM was liable under a theory of *respondeat superior*.

¶ 3    Plaintiff moved the trial court *in limine* to bar defendants from: (1) introducing testimony that Alex stopped suddenly at a yellow light before the accident; and (2) using Laura's Facebook posts during cross-examination. The trial court refused to bar the sudden stop testimony because it formed the basis of a general defense to liability and no affirmative pleading was required. The trial court initially reserved its ruling, but allowed defense counsel to use the Facebook posts during cross-examination. During the jury trial, the trial court removed a juror for being untruthful about a gesture he allegedly made to Alex. At the close of plaintiffs' case, they moved for a directed verdict on all claims. The trial court allowed the jury to decide whether defendant's conduct was negligent.

¶ 4    The jury returned a verdict in favor of Laura and against defendants. Laura was awarded $96,000 in damages and $10,000 in punitive damages. Alex received nothing. Plaintiffs' motion for a new trial was denied. On appeal, plaintiffs claim the trial court committed several reversible errors. For the following reasons, we affirm.

¶ 5                                    BACKGROUND

¶ 6    On November 8, 2013, defendant rear-ended a car occupied plaintiffs Laura, Alex, and their two children. Alex was driving, Laura was in the passenger seat and their children were seated in the back. A police officer arrived on the scene to investigate the accident and called an ambulance for Laura. She was transported to the hospital. Defendant spoke with the officer about the accident and told him plaintiffs' car made a sudden stop at a yellow light before impact. During the conversation the officer smelled alcohol on defendant's breath. Defendant was asked and agreed to perform field sobriety tests. Defendant failed the tests and was placed under arrest. At

the police station, defendant took a breathalyzer test. Defendant's blood alcohol content (BAC) was .215 which is over the legal limit.

¶ 7    On November 5, 2015, plaintiffs filed a five-count complaint against defendant and CFM in the circuit court of Cook County. Laura claimed she sustained injuries to her neck as a result of defendant's negligence, and willful and wanton conduct (Counts I and II). Alex sought damages for loss of consortium (Count IV). Both plaintiffs alleged that defendant was acting within the course and scope of his employment at the time of the accident and CFM was liable for their injuries (Counts III and V). On June 22, 2017, plaintiffs amended their complaint to include punitive damages. Defendants answered the amended complaint on September 5, 2017, and pleaded no affirmative defenses.

¶ 8    Before trial, on April 20, 2018, the trial court held a hearing on plaintiffs' motion *in limine*. The motion sought in pertinent parts to bar defendants from: (1) introducing testimony that Alex came a sudden stop at a yellow stoplight before the accident; and (2) presenting photographs obtained from Laura's Facebook page depicting her in Europe and other locations after the accident. The trial court refused to bar testimony of the sudden stop because it formed the basis of a "general defense" to liability. The trial court reserved its ruling on the use Laura's Facebook posts. The parties proceeded to a jury trial.

¶ 9    Plaintiffs called defendant as an adverse witness. Defendant testified that he was golfing on November 8, 2013, with his friends before the car accident. He consumed alcohol while he played and had "five mixed drinks" at the "19th hole." Defendant acknowledged he could have called a cab or asked one his golfing partners, who happened to be one of his neighbors, for a ride home. Defendant did not ask for a ride home. Instead, he decided to drive home and collided with plaintiffs' car at a stoplight. On cross-examination, defense counsel asked defendant if the stoplight

3

changed in color as he approached plaintiffs' car. Defendant answered, "[i]t was turning yellow, it turned yellow." Defense counsel asked whether plaintiffs' car came to a "sudden stop." Defendant answered, "Yes." Plaintiffs' counsel made no objection.

¶ 10   Laura testified that she worked as a stewardess for American Airlines earning $5,000 per month. On November 8, 2013, she had dinner with her husband and two children at a restaurant in Schaumburg. On the way home, Alex stopped at a red light and they were struck by a car from behind. Paramedics placed a collar around Laura's neck. She was transported to the hospital and later discharged with pain medication.

¶ 11   Laura acknowledged her neck pain existed before the car accident. She also testified that after the accident, on February 27, 2014, she fell mid-flight and injured her hip and elbow. Laura testified this event did not cause her to suffer any neck pain. But she acknowledged it may have temporarily added to her already existing pain and discomfort. Laura characterized the pain she felt after her fall as "totally different" from the pain she experienced after the accident. Laura suffered from recurring headaches and her neck pain grew "unbearable." There were days when she was unable to do anything at all.

¶ 12   Eventually, Laura's primary care physician referred her to an orthopedic surgeon. She underwent neck surgery on September 3, 2014, and required "24/7 care" during recovery. Laura was still experiencing neck pain three to four months post-surgery, and there were several activities that she could no longer perform or enjoy. Laura's medical expenses totaled $218,502.21 and overall, she was unable to work for eight or nine months.

¶ 13   Before cross-examination, defense counsel asked the trial court in a sidebar for permission to question Laura about her Facebook posts. The trial court granted the request in part and barred

counsel from using a post which depicted Laura shopping at Barney's Department Store. Plaintiffs' counsel made no objection.

¶ 14    On cross-examination, Laura testified that her neck and shoulder pain existed as early as March 15, 2006. In January of 2009, she was injured at work in a "severe turbulence incident" and her preexisting injuries "flared up." Laura suffered another turbulence incident on November 12, 2012, saw a doctor and complained of neck pain. On February 27, 2014, Laura yet again experienced turbulence on a flight, and fell on her hip and elbow.

¶ 15    Using her Facebook posts, defense counsel elicited testimony Laura indicating she was at a department store in London, England, on November 25, 2013, traveled to Paris, France, on December 14, 2013, and attended "London Fashion Week" twice on two different trips to London in February of 2014. Laura further confirmed that after the car accident, she and her friend had their eyebrows threaded, she went to "Buddah-Bar" in London, and attended a Selena Gomez concert with her daughter.

¶ 16    Alex testified that he had dinner with his family on November 3, 2013, and took Schaumburg Road on the drive home. Alex approached a stoplight that turned yellow and then red. He came to a "normal stop" and "was there in the car for about a good 30 seconds" before the car was struck from behind. Alex received no warning there was about to be a collision. After the accident, defendant came to Alex's window and asked if the everyone was okay. Alex characterized defendant's speech as "slurred" and he smelled of alcohol. Alex acknowledged that Laura experienced neck pain before the collision, but testified that her condition grew worse after. Laura was in "chronic pain" and "on heavy medication." Alex had to take over responsibility for household chores. He characterized the change in Laura as "drastic" and though it was "embarrassing to say," Alex indicated that the accident affected their relationship.

¶ 17    Dr. Brook Belcher, a board-certified physician, testified that she examined Laura on November 13, 2013, shortly after the car accident. During the visit Laura complained of cervical spine or neck pain that was intermittent, "located on the right posterior neck and into her trapezius or between her neck and shoulders." The pain radiated into the right side of Laura's head, upper arm and shoulder blade areas, and her right elbow. Dr. Belcher believed Laura had a preexisting neck condition but noted that the right arm symptoms appeared to be new and different. On cross-examination, Dr. Belcher testified that she diagnosed Laura for "cervical spondylosis," or arthritis in the neck, when she first saw her on April 28, 2010. Regarding Laura's onset of neck pain, Dr. Belcher testified that Laura said she "was working as a flight attendant, the plane hit turbulence and dropped and she felt a strain in her neck."

¶ 18    Dr. Eldic Karaikovic, a board-certified orthopedic surgeon, testified that he treated Laura for neck pain and performed her surgery. Laura came to Dr. Karaikovic complaining of "posterior, back of the neck, pain radiating down the back of her head and down in both shoulders and arms *** numbness in both arms, especially in the right, second and third fingers and left index finger, and the numbness in the arms was equal right to left." Following a physical examination, Dr. Karaikovic diagnosed Laura with "[d]egenerative disc disease" which "is the natural disintegration of the cushion of the vertebrae that occurs with time." A magnetic resonance imaging (MRI) scan of Laura's cervical spine confirmed a "mild left disc herniation at the C5-C6 level, between vertebrae 5 and 6," which was irritating Laura's nerve. A second MRI revealed a disc "protrusion" in the same area. Dr. Karaikovic initially recommended non-invasive treatments, including an "epidural steroid injection," but later determined when Laura's pain did not go away that surgery was necessary to remove the pressure on her nerve.

¶ 19 Laura underwent neck fusion surgery on September 3, 2014. Dr. Karaikovic testified that the surgery was successful and resulted in an enormous improvement in Laura's pain symptoms. He noted, however, that Laura would "probably" experience some degree of pain her whole life. Dr. Karaikovic opined to a reasonable degree of medical certainty that the rear-end car accident on November 3, 2013, aggravated Laura's preexisting neck condition. On cross-examination, Dr. Karaikovic admitted he could not say whether the Laura's cervical spine condition resulted from trauma or degeneration. He had no opinion "one way or the other" as to whether the bulge in Laura's cervical spine was caused by an automobile accident.

¶ 20 During a break in Dr. Karaikovic's testimony, defense counsel complained to the trial court that juror J.D. "waved" at Alex as he entered the jury box and Alex nodded in response. Defense counsel told the trial court it was not an isolated incident. At a sidebar, the trial court asked J.D. about the incident and whether he had waved at anyone when he walked into the courtroom. The trial court expressed concern that J.D.'s answers were not truthful but decided to monitor the situation. J.D. was excused the next morning.

¶ 21 Officer Sachen of the Streamwood police department testified that on November 8, 2013, he was on duty and responded to the scene. Officer Sachen determined that defendant had struck plaintiffs' car from behind. While speaking with defendant, he noticed "the smell of alcohol coming from [defendant's] person." Defendant agreed to perform field sobriety tests and failed them. Officer Sachen placed defendant under arrest for driving under the influence of alcohol and transported him to the police station. Defendant took a breathalyzer test. His blood alcohol content was .215, "just under 3 times" the legal limit. On cross-examination, Officer Sachen confirmed that his police report reflected Alex's statement that he was "stopping" for a yellow light when the accident occurred.

¶ 22    Plaintiffs moved for a directed verdict on all claims and sought a directed finding on the issue of intoxication. Defendants opposed the motion, claiming the evidence raised a question of fact for the jury to decide. The trial court refused to enter a directed verdict on Laura's negligence claim because "there is a dispute here, and there's a defense, apparently a sudden stop." However, the trial court entered a directed verdict on Laura's willful and wanton conduct claim and made a directed finding that defendant was intoxicated.

¶ 23    Defendants called Dr. Marc Soriano, who testified that Laura suffered a non-permanent, soft-tissue sprain or "whiplash" in the rear-end accident. Dr. Soriano compared the MRI scans of Laura's neck taken before and after the accident and testified there was "no change." He believed the surgery performed on Laura by Dr. Karaikovic was medically unnecessary and that it had no chance of relieving her pain symptoms. Defendants briefly re-called defendant to the stand, who testified that he entered a plea of guilty to the offense of driving under the influence of alcohol and had his driver's license "revoked."

¶ 24    The jury returned a verdict for Laura and against defendants. The jury awarded Laura $96,000 in damages: past and future medical expenses ($20,000), past and future pain and suffering ($65,000), past and future loss of normal life ($10,000) and lost time and salaries ($1,000). The jury also awarded Laura $10,000 in punitive damages on her willful and wanton misconduct claim against defendant. The jury found in favor of defendant and against Alex on his loss of consortium claim.

¶ 25    On May 29, 2018, plaintiffs filed a motion for a new trial. They amended their motion on June 29, 2018. Plaintiffs claimed the trial court committed reversible error when it: (1) allowed defendants to present the sudden stop evidence and Facebooks posts to the jury; (2) removed J.D. mid-trial; and (3) refused to enter a directed verdict in favor of Laura on her negligence claim.

Plaintiffs also contended the jury should have received instructions on contributory negligence and the jury's award of damages was manifestly inadequate. Plaintiffs' motion for a new trial was denied on September 18, 2018.

¶ 26 Plaintiffs timely filed a notice of appeal on October 15, 2018. Jurisdiction is proper under Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017). Plaintiffs seek a reversal of the jury' verdict. Defendants claim the verdict should stand.

¶ 27                                                  ANALYSIS

¶ 28 We note at the outset that plaintiffs failed to object to the introduction of the sudden stop evidence and Laura's Facebook posts at trial. It is axiomatic that "[w]hen a motion *in limine* is denied a contemporaneous objection to the evidence at the time it is offered is required to preserve the issue for review." *Simmons v. Garces*, 198 Ill. 2d 541, 569 (2002). For appellate purposes, the denial of a motion *in limine* is a nonevent because the motion serves merely as the preview of an objection that must be made during the trial in response to some particular evidence that the opposing party offers. *People v. Hancock*, 2014 IL App (4th) 131069, ¶ 123. Accordingly, plaintiffs failed to make the requisite objections in the trial court and forfeited their arguments on appeal. But absent forfeiture, plaintiffs' arguments would fail.

¶ 29 A trial court has broad discretion to grant or deny a motion *in limine* as part of its inherent power to admit or exclude evidence. *City of Quincy v. Diamond Construction Co.*, 327 Ill. App. 3d 338, 342–43 (2002). A trial court's decision to grant or deny a motion *in limine* will not be reversed absent a clear abuse of discretion. *Id*. An abuse of discretion exists where no reasonable person would agree with the position of the trial court. *Brax v. Kennedy*, 363 Ill. App. 3d 343, 355 (2005).

¶ 30    The testimony of Alex's alleged sudden stop at a yellow light formed the basis of a general defense to liability, not the affirmative defense of contributory negligence that must be plainly set forth in a party's answer. See *Black v. Laggren*, 313 Ill. App. 3d 39, 44 (2000) ("[a] rear-end collision does not create an automatic inference of negligence; it must be determined if the defendant was acting reasonably or if the collision was unavoidable"). Defendant accepted no fault for the accident and made clear at the hearing on plaintiffs' motion *in limine* that he intended to defend in part on unavoidability: "the reason that this incident happened is because [Alex] came to a sudden stop *** [t]hose are facts as seen by my guy at the time, that he was coming up to the stop sign, the driver in front of him came to a sudden stop, and he was unable stop." The trial court correctly understood this as a general defense to liability and did not err when it allowed defendant to present testimony of Alex's alleged sudden stop to the jury. *Casey v. Pohlman*, 198 Ill. App. 3d 503, 508 (1990) (responsibility of the trier of fact to determine whether the accident was unavoidable).

¶ 31    Based on our decision we need not reach the questions of whether prejudice resulted from the jury's: (1) consideration of the sudden stop evidence; or (2) deliberation without jury instructions on contributory negligence. Defendants did not raise an affirmative defense to liability. The jury was entitled to hear the sudden stop evidence, plaintiffs were not surprised by it and contributory negligence was simply not at issue. We note that plaintiffs' counsel failed to proffer any contributory negligence instructions to the trial court. Plaintiffs cannot complain that a decision the trial court never had an opportunity to make was incorrect.

¶ 32    We reject plaintiffs' argument that the jury should have never seen or heard testimony about Laura's travels and activities as depicted in her Facebook posts. Plaintiffs claim the posts were prejudicial and impermissibly depicted Laura as a woman of considerable wealth (citing

*Fopay v. Noveroske*, 31 Ill. App. 3d 182, 199 (1975) ("when compensatory damages are in issue, evidence of a party's wealth is clearly inadmissible"). As defendants argue, the Facebook posts tended to show that Laura was not in debilitating pain after the accident as she had testified on direct examination. The severity of Laura's injuries was a fact squarely at issue. Defendant was entitled to introduce the Facebook posts in an attempt to show that Laura's injuries resulted, not from the accident on November 8, 2013, but from her mid-flight fall on February 27, 2014. The record reflects the trial court carefully examined the Facebook posts, excluded some as prejudicial, admitted others as probative, and did not abuse its discretion.

¶ 33    Plaintiffs claim the trial court should have granted their motion for a directed verdict on Laura's negligence claim because the evidence "readily satisfied" the *Pedrick* standard. See *Pedrick v. Peoria & Eastern Railroad Co.*, 37 Ill. 2d 494, 510 (1967) ("verdicts ought to be directed *** only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand"). We disagree. *Pedrick* instructs that judges should "carefully preserve the right of the parties to have a substantial factual dispute resolved by the jury, for it is here that assessment of the credibility of witnesses may well prove decisive." The trial court did just that; it preserved a substantial factual dispute over the sudden stop for the jury to decide. *Pedrick*, 37 Ill. 2d at 504.

¶ 34    Alex testified that he watched the stoplight on Schaumburg Road turn from yellow to red, that he came to a full stop and stayed in place for "30 seconds" before his car was struck from behind. Defendant testified to the contrary, and told the jury that Alex suddenly stopped his car at a yellow light. Officer Sachen said Alex told him he was "stopping for a yellow light in the right lane, when he was struck from behind." The record shows that liability turned on the resolution of

testimonial conflicts and determinations of witness credibility. It is error to direct a verdict under such circumstances when the evidence gives rise to a factual dispute or where resolution of conflicting evidence may determine the outcome. *Savage v. Martin*, 256 Ill. App. 3d 272, 283 (1993). Accordingly, the trial court was correct to allow the jury to decide Laura's negligence claim.

¶ 35    Plaintiffs separately argue that the trial court's decision to direct a verdict on Laura's claim for willful and wanton misconduct, but not her negligence claim, confused the jury and caused them to suffer prejudice. We do not see how plaintiffs could have suffered prejudice when the trial court instructed the jury that defendant was intoxicated at the time of the accident and had engaged in conduct worse than ordinary negligence. See *Doe v. Coe*, 2019 IL 123521, ¶ 34 (willful and wanton conduct is an aggravated form of negligence). Perhaps the trial court's directed verdict was a boon to plaintiffs' case. It is at best unclear given the jury's finding in favor of Laura. Plaintiffs' claims of prejudice are nothing more than speculation.

¶ 36    Plaintiffs ask us to grant a new trial because the jury's award of damages was manifestly inadequate and reflected an impermissible compromise. We remain unpersuaded.

¶ 37    A reviewing court should not interfere with a jury's award of damages unless the proven elements of damages were ignored, or the amount awarded bears no reasonable relationship to the loss suffered by the plaintiff. *DiFranco v. Kusar*, 2017 IL App (1st) 160533, ¶ 22. Illinois courts have routinely held that the amount of damages to be assessed is peculiarly a question of fact for the jury to determine and that great weight must be given to the jury's decision. *Snelson v. Kamm*, 204 Ill. 2d 1, 36–37 (2003). Personal injury cases, by their nature, make it "impossible to establish a precise formula to determine whether a particular award is excessive or not." *Id*. at 37. When reviewing a question as to the adequacy of damages, the court must consider the record as a whole.

*Id.* Jury verdicts which indicate compromises were made on damages and liability cannot be allowed to stand. *Winters v. Kline*, 344 Ill. App. 3d 919, 926 (2003). An award of damages that does not bear a reasonable relationship to the evidence presented at trial is an indication of a compromised verdict. *Bruzas v. Richardson*, 408 Ill. App. 3d 98, 106 (2011).

¶ 38 Viewing the record as a whole, the jury's award of damages was not inadequate, and we see no evidence of a compromise. The loss Laura claimed to have suffered was hotly disputed at trial. The picture was not clear, but rather muddied by evidence of Laura's preexisting neck pain and other injuries. Questions of fact abound; we decline to upset the jury's award of damages.

¶ 39 No element of damages was ignored by the jury. Laura was awarded damages for past and future medical expenses ($20,000), past and future pain and suffering ($65,000), past and future loss of normal life ($10,000) and lost time and salaries ($1,000). The jury also awarded Laura $10,000 in punitive damages. To be sure, the jury awarded Alex nothing. But the jury was under no obligation to credit Alex's testimony or believe that he suffered a loss of consortium. That the jury awarded damages to Laura on her claims does not *ipso facto* mandate a finding in favor of Alex on his loss of consortium claim, whether the evidence was unrebutted (as plaintiffs allege) or otherwise.

¶ 40 Plaintiffs have failed to show the damages awarded by the jury bear no reasonable relationship to the loss claimed. Laura herself at trial reflected on several instances, both before and after the car accident, when her airplane experienced turbulence and she suffered or at least complained of injury in varying degrees. Defendants' partial theory at trial was that: (1) Laura experienced neck, arm and shoulder pain before the accident; (2) proceeded to carry on as normal after the accident and engaged in physical activities with friends and family abroad; and (3) then experienced the pivotal injury on February 27, 2014, when she fell mid-flight and injured her hip

13

and elbow. Evidence was presented that Laura neck issues were "degenerative" in nature and not the result of impact or trauma. Laura's expert could not make the determination either way and testified that he had no opinion "one way or the other" as to whether the bulge in Laura's cervical spine was caused by an automobile accident. Defendants' retained expert told the jury that the M.R.I. taken of Laura's neck before and after the accident showed "no change" and opined that Laura's neck surgery was not medically necessary. Based on this record, the jury could have determined the car accident caused Laura to suffer a new injury, the aggravation of an existing injury, or both, but that several other factors including prior injuries, arthritis or degeneration were additionally at play.

¶ 41    Plaintiffs make a fuss because the damages awarded by the jury were less than her medical expenses. We are not aware of a rule requiring a jury to award damages in an amount equal to or greater than the amount of medical expenses incurred by a plaintiff in a contested personal injury case. Plaintiffs further claim "the jury disregarded the medical testimony presented by both sides, and came out in the middle." But the jury could have credited each expert's testimony in part and awarded damages as they saw fit. There is no evidence of a complete disregard one way or the other, and the jury was not beholden to either expert's testimony. We remain unconvinced by plaintiffs' arguments that the jury's award of damages was manifestly inadequate or reflected a compromise. Reversal is not warranted.

¶ 42    Finally, plaintiffs claim the trial courts' mid-trial removal of juror J.D. must be automatically reversed because it affected the impartiality of the jury (citing *People v. Brown*, 2013 IL App (2d) 111228 (finding the trial court's decision to allow the State to remove a juror mid-trial through the use of a peremptory challenge constituted structural error and required

automatic reversal). First, as defendants argue, plaintiffs' counsel failed to object to the trial court's removal of J.D. But if an objection were made, plaintiffs' argument would still fail.

¶ 43 Plaintiffs rely entirely on *Brown*, which is inapplicable. No peremptory challenge was used to remove a juror mid-trial. Accordingly, the issue here is not whether automatic reversal is warranted (because it is not), but rather, whether the trial court abused its discretion when it removed J.D. and whether prejudice resulted. See *People v. Runge*, 234 Ill. 2d 68, 105 (2009) ("[t]he applicable standard of review, after the trial judge has made an appropriate inquiry, is an abuse of discretion standard, which recognizes that the trial court has wide discretion in deciding how to handle and respond to allegations of *** misconduct that arise during a trial"). Because plaintiffs made no attempt to show on appeal how they suffered prejudice ("[t]o be clear, we do not contend that a biased juror – that is, a juror challengeable for cause – was seated in juror J.D.'s place"), we need go no further. A new trial is not warranted.

¶ 44                                          CONCLUSION

¶ 45    Accordingly, we affirm.

¶ 46    Affirmed.