James Lee **BARNA**, as Special Administrator of the Estate of James S. Barna, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

No. 95 C 6552.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 16, 1999.

Roger Pascal, William Edward Meyer, Jr., Schiff, Hardin & Waite, Chicago, IL, for Plaintiffs.

Jonathan C. Haile, United States Attorney's Office, Chicago, IL, Steven J. Riegel, Senior Aviation Counsel, Department of Justice, Washington, DC, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KENNELLY, District Judge.

On May 4, 1993, James S. Barna (Barna), a twenty-six year old pilot, was flying a night cargo flight for his employer, Viking Express, Inc. Barna's airplane crashed just outside of Lone Rock, Wisconsin, and Barna was killed instantly. His father James Lee Barna, acting as administrator of Barna's estate, has sued the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2674 & 1346(b), claiming that the crash occurred because of the negligence of Federal Aviation Administration (FAA) air traffic controllers in directing Barna and the negligence of the National Ocean Service (NOS), which is part of the National Oceanic and Atmospheric Administration, in preparing a chart depicting an approach to the Lone Rock airport. This Court has jurisdiction under 28 U.S.C. § 1346(b).

On September 25, 1998, Judge Elaine Bucklo denied defendant's motion for partial summary judgment as to the chartmaking part of the case, holding that defendant had failed to show as a matter of law that the conduct of the chartmakers was subject to the "discretionary function" exception to the FTCA found in 28 U.S.C. § 2680(a). *Barna v. United States*, 22 F.Supp.2d 784 (N.D.Ill.1998). The case was transferred to this Court in late June 1999. The Court held a bench trial that began on October 25, 1999 and concluded on November 12, 1999. This constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT

Prior to his death, Barna resided in Naperville, Illinois with his parents, James and Helen Barna. Barna was a professional pilot who had pursued a career in aviation since he was a teenager. He obtained his first pilot's license at age sixteen, and in 1991, he became licensed as an airline transport pilot. Barna also held a commercial pilot's license, an instrument rating permitting him to fly in instrument (poor) weather conditions, and a flight instructor's rating for single and multi-engine aircraft and gliders.

Barna had logged nearly 4500 hours as a pilot at the time of his death. This included over 700 hours as a pilot in command of multi-engine aircraft. He had flown about 250 hours in the 90 days before his death. On the night of the crash, Barna was flying a Beechcraft Model E–18S, commonly known as a Beech 18. He had logged 214 hours of flight time in Beech 18's. On March 23, 1993, Barna had completed a Federal Aviation Regulations Part 135 Instrument Flight Rules (IFR) check ride in a Beech 18, during which his flying skills and knowledge of the aircraft were

checked comprehensively, and he had received a satisfactory rating. Just two days before the fatal flight, Barna had flown a Beech 18 in instrument meteorological conditions, in other words, weather conditions in which the pilot must navigate the plane by reference to instruments. In short, he was fully qualified to operate this aircraft in the conditions that existed on the night of May 4.

On May 4, 1993, Barna departed from the Aurora airport in a Beech 18 at around 12:35 a.m. As was his and his employer Viking's usual practice, he was the only occupant of the plane, which was carrying copies of the New York Times to Minneapolis. He had flown this route frequently in the preceding months. On the night of the crash, the flight was identified as Viking Express Flight 902, or Titan 902.

The FAA Air Route Traffic Control Center (ARTCC) in Aurora, Illinois was responsible for air traffic control services relating to the flight at all times preceding the crash. Flight 902 was operated under IFR, meaning that Barna was given a route and other directions by air traffic controllers. The Beech 18 was properly equipped for night instrument flight. It had dual communication and navigation radios on board, and it also had a transponder, which enhances an airplane's image on radar and provides a code to help identify it to air traffic controllers.

Communications between Barna and the ARTCC were tape recorded. The tape recording of these communications was admitted in evidence at trial. This recording also includes several communications between the ARTCC and other aircraft, as well as a handful of communications between Barna and another Viking pilot, David Groth, who had left the Aurora airport shortly before Barna on Viking Express Flight 901 (Titan 901), flying the same route as Barna. Transcripts of the recordings, prepared by FAA personnel, were admitted in evidence. The Court has relied on the tapes as the primary evidence of what was said, using the transcripts as an aid to comprehension.

On the night of the crash, Thomas Demes was the FAA air traffic controller responsible for the sector that included the route Barna was flying prior to the crash. Throughout the events in question, Demes could and did observe on radar the location and altitude of Barna's aircraft. Demes' radar screen permitted him to easily change the viewing scale if he wanted or needed to focus in more closely on a particular area.

At 1:12 a.m., Barna told Demes that he was flying at an altitude of 6000 feet above sea level. Then, at 1:19:26, Barna asked Demes to identify the closest airport with an instrument approach. The term "instrument approach" is a reference to preplotted approaches to airports that can be flown using navigational aid equipment. These approaches are published in books prepared by NOS, as well as by at least one private entity. Barna had a book of NOS charts on board his Beech 18. Demes gave Barna two airport choices— Mineral Point, which at that point was about five miles from Barna and somewhat behind him, and Lone Rock, which was about twenty miles straight ahead of him. Demes asked Barna if he had a problem, and Barna replied that his left engine was failing.

Based on this communication, Barna's situation became an emergency. Demes treated it as such. He called for additional assistance from Kent Nicholson, a more experienced controller who was working a different sector, and he also obtained assistance from Deborah Pratl, another controller, and Leo Rasp, a supervisor. As events progressed, Nicholson worked closely with Demes in dealing with Barna and observing his progress on radar.

Demes gave Barna more specifics about the Mineral Point airport, including that the approach was a type of instrument approach called an "NDB" approach. Because an NDB approach required equipment that Barna's Beech 18 did not have, Barna decided to fly to Lone Rock. He asked Demes for more information about that airport, and at 1:20:41, he asked

Demes to give him a "heading" to Lone Rock. A heading is a direction, expressed in terms of degrees, with 0, 090, 180, and 270 denoting, respectively, north, east, south, and west. Demes immediately responded at 1:20:45 by telling Barna to follow a heading of 010.

Demes also told Barna at 1:20:45 that the Lone Rock airport had a "VOR–A" approach, which is a type of instrument approach that makes use of a ground transmitter called a "VOR" transmitter. Barna's Beech 18 was capable of flying VOR–A approaches, and Barna himself had done so before. The Lone Rock VOR was located five and one-half nautical miles from the airport, to the north-northeast, along the 026 radial. A radial is an imaginary line corresponding to a particular heading, again with 0 denoting north, 090 east, 180 south, and 270 west.

The NOS chart book Barna was carrying contained a chart depicting the Lone Rock VOR–A approach. The depiction consisted of the diagrams on the following page:

The published approach, for a pilot approaching the Lone Rock airport from the south, involves three parts. On the initial part of the approach, the pilot travels north-northeast away from the Lone Rock airport and past the VOR along the 026 radial. After traveling along this radial for some distance—on the chart, around four to five miles—the pilot makes a turn referred to as a "procedure turn" to reverse course. This requires the pilot to turn left off the 026 radial, travel away from that radial for about one minute, and then make a 180 degree turn and return to the inbound equivalent of the 026 radial, i.e., the 206 radial. The intermediate part of the approach involves traveling along the 206 radial (i.e., in a south-southwesterly direction) back to the VOR. The final part of the approach extends from the VOR to the airport.

The Lone Rock airport sits at 717 feet above sea level. The published approach prescribes flying the initial part of the approach at an altitude of no lower than 3300 feet above sea level, allows for a descent along the initial part of the approach to 3000 feet, and permits a continued descent along the intermediate part of the approach to an altitude of 2900 feet when the pilot reaches the VOR to begin the final approach. The chart states that the minimum descent altitude (MDA) is 1680 feet above sea level, which means the pilot cannot descend below that altitude until the airport is "made," i.e., until he can actually see the airport. The primary runway at the Lone Rock airport is aligned in an east-west direction. Assuming the pilot "makes" the airport while following the final approach course, the evidence showed that he is then permitted to circle to land by making a right (westerly) turn, traveling parallel to and past the runway, and eventually making a 180 degree turn to reverse course, align himself with the runway, and land. Plaintiff's expert Ronald Ridenour diagrammed this as follows:

(final approach course)

(east-west runway)

As indicated, Demes told Barna at 1:20:45 a.m. that Lone Rock had a VOR–A approach. Barna's aircraft was capable of flying such an approach, and Barna himself had done so before and was fully capable of doing so on May 4. However, the VOR–A approach as published in Barna's NOS chart book reflected that the full approach involved flying outbound from the airport for approximately eight to ten miles before performing the procedure turn to reverse course and return to the airport. Barna, who due to the condition of his left engine wanted to land as soon as possible, asked Demes to "vector" him for "the straight in." As both controller Nicholson and plaintiff's expert Ridenour testified, a request for vectors to a "straight in approach" seeks directions to the intermediate segment of an instrument approach like the Lone Rock VOR–A approach. While Barna did not use the word "approach" in his request, the request would have been understood by a reasonable air traffic controller, and was in fact understood by Nicholson, as seeking vec-

tors to the intermediate segment of the approach.

There apparently was, however, some confusion at the ARTCC as to what Barna had asked—though it does not appear that the two controllers realized they had different understandings of Barna's request. Nicholson clearly and correctly understood Barna to be asking for vectors to the intermediate part of the approach. Demes, however, testified that he understood Barna to be asking for vectors to the final part of the approach, i.e., to the VOR itself. Defendant's expert Joseph Beaudoin testified that Barna was reasonably understood as seeking not vectors to some point along the approach (as Nicholson or Demes believed), but rather vectors directly to the airport runway. The Court finds that Beaudoin's opinion testimony in this and other respects lacked credibility because, among other things, it was contrary to accepted pilot-controller terminology and was constructed with little regard to the evidence in the case, in particular, the testimony of the occurrence witnesses, including the controllers themselves.

Demes told Barna at 1:23:12 and 1:23:24 that the approach was not "depicted" on his radar screen, and thus he could not do what Barna had asked. The approach in fact was not shown on Demes' radar. That being the case, Demes could not vector Barna to the approach as such. Nonetheless, Demes erred in effectively telling Barna that the controllers could not give him the critical information he sought. Nicholson, who heard Demes' communication to Barna, realized this within seconds after the communication. As noted earlier, the intermediate segment of the approach followed the 206 radial, and the controllers knew this. Nicholson and other witnesses testified, and the Court finds, that it is feasible and indeed common for controllers to vector airplanes to radials. Thus the controllers easily could have vectored Barna to the intermediate segment of the VOR–A approach, and any reasonably competent controller would have known this. This is what Barna was asking for. Demes erred in telling Barna that he (Demes) could not do this.

As noted, Nicholson realized within a matter of seconds that the controllers could do precisely what Demes had just told Barna they could not do. He quickly developed a plan to vector Barna to the intermediate segment of the approach, enabling him to avoid the procedure turn and cut perhaps as much as eight minutes off the amount of time he would need to land. Nicholson's plan was to direct Barna north past the airport, to the north and west of the VOR, and then to conduct two successive right turns of 90 degrees each, first to the east and then to the south, to intercept the intermediate part of the approach course along the 206 radial just northeast of the VOR. The controllers understood the importance of getting Barna to the airport as quickly as possible, and Nicholson's plan, had it been properly communicated to Barna, would have fulfilled this purpose. The plan also had the advantage of avoiding left turns by the aircraft; a two-engine aircraft with a failing left engine may have difficulty making a left turn properly. At trial, Nicholson diagrammed his plan as follows:

(026 / 206 radial)

(VOR)

(Lone Rock Airport)

This is precisely what Barna had asked for in his communication at 1:23:06, and it is precisely what Demes had said he could not provide.

If Nicholson's plan had been communicated to Barna, the crash would have been prevented. Barna would have arrived at the airport with sufficient power and altitude to clear the hills to the airport's north and would have been able to land safely. Unfortunately, Nicholson's plan was never communicated to Barna, at least not in a way that was proper and understandable. Demes does not appear to have completely understood the plan. He testified that he believed Nicholson planned to vector Barna *to the VOR*—that is, to the start of the final approach—rather than to the intermediate course. He also testified that the plan was constantly being amended and revised; this was contrary to Nicholson's testimony, which the Court credits, that he devised the plan in its entirety and communicated it to Demes within thirty seconds after the erroneous 1:23:24 communication. Demes' misunderstanding of the plan may have contributed to his failure to communicate the plan properly to Barna and to his other errors discussed below.

Demes called Barna at 1:24:16 a.m. The evidence demonstrated that Barna understood Demes to say he could vector Barna to the north side of the VOR and that "you (you'll) have to do the full procedure turn." This was not how the FAA-prepared transcript described the transmission. The transcript reads as follows:

> Titan Titan Air nine zero two I can vector you around to the north side of the VOR sir **after you'll don't have to** do the full procedure turn if you'd like that sir (emphasis added).

The problem with the transcript is that it did not accurately report how a listener would have heard the communication. The Court finds that the word "don't" was swallowed and not readily understandable by a listener under the circumstances. Demes' statement was reasonably understood as telling Barna that "you'll have to" do the full procedure turn—contrary to Nicholson's plan.[1]

At trial, Demes stated that he had heard the transmission several times before and always understood it to say what the FAA transcript reflected. But he testified that upon hearing the tape again shortly before trial, it had sounded to him as if he had said something different:

1. There was no suggestion that a pilot would have heard the transmission any more clearly than it sounded on the tape.

Titan Titan Air nine zero two I can vector you around to the north side of the VOR **so that you don't have to** do the full procedure turn if you'd like that sir (emphasis added).

The FAA transcript's version of the conversation had reflected at best garbled syntax and at worst an incomprehensible statement by Demes to Barna; Demes' freshly-minted version that he related at trial made it far better from his and defendant's standpoint. Yet Demes' new version, like the FAA's old one, did not correspond to how a listener would have heard the communication. It is noteworthy, however, that upon repeated hearing prior to trial, Demes himself had not been able to understand his transmission in the way he says he intended it.

After considering all of the evidence, and understanding the communication as one in Barna's position would have heard it that night, the Court finds that Demes' statement was reasonably and foreseeably understood as telling Barna that he in fact *would* have to fly the full procedure turn. While Demes may have wanted to tell Barna that he would not have to fly the full approach, Barna plainly did not understand him that way. It is clear from Barna's comments to Groth (whom the Court found to be a highly credible witness), from Barna's later actions, and indeed from the content and tenor of his response to Demes at 1:24:25, that Barna understood Demes not to be giving him the good news that the controllers could do what Barna asked, but rather to be repeating the bad news that they could not vector him for the straight-in approach and that he would have to fly the full procedure turn. Barna replied to Demes' comments by stating, "that's my only choice I guess," a clear indication that what he had just heard was not a solution to his problem, but rather was further confirmation that no solution could be provided. What Barna believed he had been told, in substance,

was that he *would* have to perform the full published approach, including the procedure turn.

This misunderstanding was critical, for it lead directly to Barna's death. The Court finds that the misunderstanding was caused by Demes' errors in communicating with Barna, which in turn may have been the result of Demes' apparent confusion as to what the plan was and whether it had been finalized. Whatever the reason, responsibility for the misunderstanding lies with Demes. In communicating with Barna at 1:24:16, Demes gave no indication that his earlier statements were in error; no indication that he was correcting his earlier refusal of vectors to the "straight-in"; and indeed no indication that what he was telling Barna was any sort of a change in plans at all. In addition, when Demes communicated to Barna a heading of 350 at 1:24:27 a.m., he did not identify the purpose of that vector, which a controller is duty-bound to do, as even defendant's expert Beaudoin admitted. Finally, Demes' 1:24:16 transmission, considered on its own terms, did not correctly communicate to Barna the controllers' plan. A controller's duties frequently require him or her to make a communication quickly and then move on (though that was not the case here; at that point, there was little or no air traffic in the area, and Demes was dealing exclusively with Barna). Human beings do not always speak in precise prose, and some mistakes in diction may be excusable depending on the circumstances. This error, however, does not fall into the category of excusable slip-ups. Demes, who in some other transmissions made errors but quickly corrected them, made no effort to do so here, even after hearing Barna's dejected response at 1:24:25, which as noted before clearly indicated that Barna had not understood that he had been given a new plan. If Demes had not erred, there would have been no misunderstanding, and Barna would have lived.[2]

---

2. The Court does not find credible Demes' testimony that he planned to give Barna the purpose of the vectors at a later point. In any event, the purpose was *never* given to Barna

by Demes or any other controller, and under the circumstances, a later explanation would not have discharged Demes' duty.

Defendant seems to take the position that Barna simply chose to ignore the controllers' vectoring plan. After considering all the evidence, and in light of the Court's finding that David Groth was a credible witness, the Court finds that Barna actually followed the instructions he understood the controllers to have given him. Barna's failure to follow Nicholson's plan resulted not from Barna's own decisions or from any lack of care on his part, but rather from the controllers' failure to communicate the plan in conformity with their duties and obligations.

As a result of the controllers' miscommunication, Barna thought that he had to fly the full approach as published, including the full procedure turn at a distance of approximately four miles outside the Lone Rock VOR. Bernard Coogan, defendant's piloting expert, claimed that Barna had the discretion to perform the procedure turn sooner, indeed immediately upon reaching the VOR while outbound, but he conceded that nothing in the published approach, the FAA's guidelines for instrument approaches, or Barna's training would have told Barna this. The Court found Coogan's testimony on this and several other topics to be tainted significantly by the benefit of 20–20 hindsight and to otherwise lack credibility.

Despite having caused and failed to clear up Barna's misunderstanding, the controllers had at least one more opportunity to repair the damage. It soon became evident to the controllers that Barna was not following the 350 course heading that Demes had given to him at 1:24:27 and indeed that what Barna was doing differed radically from Nicholson's plan. As Barna neared the VOR, he changed course and headed in a northeasterly direction along or near the 026 radial. In other words, he began to fly the initial or outbound segment of the published VOR–A approach. If nothing else told the controllers that Barna had not understood their plan, this should have done so.

Demes and Nicholson observed Barna's course change on Demes' radar screen.

The Court finds that they observed and recognized the change in directions just as Barna passed the VOR, at or just before 1:29:00 a.m. Both Demes and Nicholson tried to claim at trial that they did not observe this until later, but their testimony in this regard was not credible. Demes initially testified that he realized Barna had changed course just as he passed the VOR, but he then attempted to backtrack and change his testimony. Nicholson essentially testified in his deposition that he likewise had observed the course change as Barna passed the VOR, but he attempted to back away from this at trial. By their demeanor and the content of their testimony when considered in light of the other evidence in the case, these witnesses' trial testimony lacked credibility on this score. The Court likewise rejects for lack of credibility defense expert Beaudoin's testimony that the controllers would not have realized that there had been a course change until a good deal later; among other things, Beaudoin essentially ignored the contrary deposition and trial testimony of the controllers themselves, evidently preferring instead to come up with a conclusion that had no legitimate anchor in the evidence.

The Court also finds, based on the testimony of several witnesses, that once the controllers realized Barna had changed course, it was incumbent upon them to contact him to ask what he was doing. If they had done so promptly (or, indeed, at all), they would have learned that Barna had not understood the change of plans, and the misunderstanding would have been cleared up, saving Barna valuable minutes and enabling him to reach the airport safely. But the controllers failed to contact Barna to ask him why he had changed course; in fact they never gave him any other vectors at all in furtherance of Nicholson's plan. Perhaps the controllers were inattentive, or perhaps they made an unwarranted and erroneous assumption that Barna had decided on his own to reject their plan. In the end, the Court cannot say *why* they did not recon-

tact Barna, but we need not dwell on the why; what is critical is that they *did not* do so, as they should have.[3]

At trial, defendant and the controllers made a rather feeble attempt to pin their failure to recontact Barna on Barna himself, saying that when he told them at 1:26:26, in response to the controllers' statement that he was near the airport (and thus might be able to see it) to "standby a second," they somehow relied on this in not reestablishing communications. It was demonstrated beyond dispute that this was no reason at all, and certainly not a reason sufficient to justify the controllers' radio silence for what amounted to four minutes (save a brief reference at 1:29:04 to emergency equipment that might be available at the Lone Rock airport), without once asking Barna why he was not following the heading Demes had given him.

Defendant also suggested that Barna might not have been listening to the radio because he either switched it off or was paying attention to his communications with Groth. The Court finds otherwise. The Court credits Groth's testimony that based on his discussions with Barna, Barna was in fact listening to the air traffic control frequency even while communicating with Groth—consistent with standard operating procedure for Viking pilots and for Barna himself. The obligation to reestablish contact, moreover, was that of the controllers, not Barna. Indeed, Barna, having been told (he believed) three times that the controllers could not vector him for the "straight-in," was flying the full published approach and reasonably perceived no need to communicate with them during those critical minutes. There was no reason to expect Barna to respond to Demes' 1:29:04 call about emergency equipment or to otherwise initiate contact.

At 1:25:42, Demes said to Barna, "at your discretion maintain three thousand three hundred as you start your descent...." At that point, Barna was flying at an altitude of 6000 feet.[4] He remained at that altitude until about 1:28, as he was nearing the VOR on the outbound part of the approach. He then began to descend. At 1:30:31, when Barna was at an altitude of about 4000 feet, Demes told Barna to "maintain three thousand three hundred ... until established on a published segment of the approach." Though it is unclear whether Barna heard this, he continued to descend until he reached 3300 feet at 1:32:09, while conducting the procedure turn.

Barna's descent to 3300 feet, which began at about 1:28, was consistent with the published approach and the directions he had received from Demes, and he remained at that altitude until approximately the point at which he completed the procedure turn. After that point, both the published approach and Demes' 1:30:31 transmission permitted Barna to descend further, so as to reach an altitude of 2900 feet when he arrived back at the VOR, the beginning of the final part of the approach. On the final approach, Barna could continue to descend to an altitude of 1680 feet above sea level, the "minimum descent altitude" or MDA, which is set so as to provide a cushion above obstacles that may be along or near the line of the approach course.

At some point while conducting the approach, Barna began to lose altitude involuntarily because he had to shut down the left engine of his Beech 18. While it is not clear exactly when this occurred, the Court finds that around 1:35 a.m., Barna began to have trouble maintaining altitude. If the controllers had properly communicated Nicholson's plan or had contacted Barna when they realized he was heading north-

---

**3.** Defendant claims that Barna had the discretion to reject the controllers' directions. Even if so, that did not absolve the controllers from the responsibility to check back with him to find out why he was doing so.

**4.** All altitudes are stated in feet above sea level, except where otherwise noted.

east away the airport, Barna would not have had to fly such a long distance, and the failure of his engine would not have prevented him from reaching the airport. At the point at which he began to lose altitude involuntarily, however, Barna was too far from the airport to be able to land safely.

When Barna rejoined the approach course heading back inbound toward the VOR, he was at 2800 feet, which was slightly below the prescribed altitude. His altitude continued to deteriorate after that. At 1:36:50, radar showed that Barna, who had not yet arrived back at the VOR, was at 2600 feet. This too-low altitude was the direct result of the controllers' errors that had effectively forced Barna to fly the full approach with the procedure turn.

The NOS approach chart depicted a single obstacle on or near the final approach course, a hill about one nautical mile south-southwest of the VOR with trees that extended to 1260 feet above sea level (we will refer to this as the "1260–foot hill"). This, however, was not the only hill in the immediate area. In fact, a bit further to the south, a line of hills extended along an east-west line, in other words parallel to the primary airport runway. Among these hills was a hill with trees extending to about 1200 feet situated just west of the approach course, north of the runway by about 9000 feet, or one and one-half nautical miles (we will refer to the line of hills collectively as the "1200–foot hills"). These hills were not illuminated in any way.

Barna continued along the approach course until shortly before he reached that line of 1200–foot hills. The Court finds that he was able to and did in fact see the airport runway while still on the final approach course. The east-west runway has lights located along either side. At night, these can be activated remotely by a pilot by keying a particular frequency on his radio. As he approached the airport, Barna turned on the runway lights to assist him in locating the runway. Within two and one-half miles of the airport, Barna

emerged from the clouds and saw the runway lights. Then, when he was approximately one and one-half miles north of the airport, and still able to see the runway, Barna made a right turn to a westerly heading of 285—290 to circle so that he could land going eastbound on the east-west runway. This right turn was consistent with, and the Court finds that it was in fact, a turn of a standard type to begin a landing as previously described and diagrammed. *See* p. 8 *supra.* The Court was not persuaded by Coogan's testimony that Barna made this turn not in a planned way, but as a sort of "flinch" upon seeing the hills immediately in front of him.

The government claims that due to weather conditions, it was impossible for Barna to see the airport from anywhere near as far away as he was when he turned to the 285–290 heading. There are no reports of the actual weather at Lone Rock during the early morning hours when the crash occurred. Each party called an expert who had attempted to reconstruct the likely weather conditions, including cloud cover, fog, and visibility. Both experts acknowledged that their work involved a considerable amount of estimation and judgment.

At the time of the accident, a front was moving across Wisconsin. It was established that the weather in Madison, Wisconsin, which at the time in question was agreed to have been to the east of the front (in other words, the front had not yet arrived there), was better than the weather in Lacrosse, Wisconsin, which was to the west of the front. Both experts agreed that given the nature of the front, weather and visibility would have been better ahead of the front than behind the front. Plaintiff's expert Wayne Peterson testified that the front was still to the west of Lone Rock at the time of the accident. Defendant's expert Dr. L. Ray Hoxit testified that it had already passed through Lone Rock; however, he had previously told another government expert, Joseph Beaudoin, that he considered the weather

at Lone Rock to have been similar to that at Madison, which the front had not yet reached.

Charts plotting the front prepared by the National Weather Service do not supply the answer to the experts' dispute; they are not drawn at a level of detail sufficient to determine precisely where the front was at the time of the accident. Both parties' experts were required to attempt to reconstruct where the front likely was, based upon available data. Both conceded that this is not an exact science; in particular, Hoxit indicated that any placement of the front could be accurate only within 10 to 20 miles. In this case, however, a 10 to 20 mile difference in placement of the front is critical.

Based on all the evidence, including an evaluation of the believability of the testimony of the experts, the small amount of direct evidence of actual conditions, as well as the way in which Barna conducted himself as he approached the airport, the Court finds that the front had not yet reached Lone Rock at the time of the accident and that weather conditions were such that Barna was able to, and did, see the airport as he approached it, prior to making the right turn immediately before the crash. Specifically, the Court found Peterson's testimony to be more believable than Hoxit's.[5] The Court finds that there was visibility of at least two miles and perhaps as much as four miles, and a cloud ceiling that was high enough that Barna emerged from the clouds during his descent and, before making his right turn, was able to and did see the airport.

Unfortunately, when Barna started his right turn, he was too low, as a direct and foreseeable result of the controllers' earlier errors. Barna had no idea, and had no reason to know, that there were any hills or obstacles along the final approach other than the 1260–foot hill marked on the NOS

chart, which he had already passed. It is true that he was below the MDA as he conducted this turn, but the evidence showed that a pilot may descend below the MDA once the airport is "made," as it was here. No witness testified, and the evidence did not show, that it was improper to begin a turn to downwind, as Barna did, 9000 feet from the airport.

At or prior to making his right turn to prepare to land, Barna had turned on his airplane's landing lights. Shortly after he turned, he saw terrain in front of him. Anticipating a crash, he quickly lowered the landing gear to cushion his impact and put the throttle of his one remaining engine on idle; both actions followed proper procedure for an emergency landing. He struck a tree-covered hill about 9000 feet north of the airport and was killed instantly. Barna crashed at a point about 1080 feet above sea level.

Defendant contended, and its expert Bernard Coogan testified, that the reason Barna was at such a low altitude at the time of the crash was that he prematurely lowered his landing gear, increasing the drag on the airplane and causing it to lose altitude more quickly. The Court did not find Coogan's testimony credible or persuasive. His calculation was admittedly based on estimates and judgments, and based on the Court's view of Coogan's general lack of credibility, it is unwilling to credit his judgments. Coogan was more of an advocate than a true expert. His demeanor while testifying, and the content of his answers, persuaded the Court that his opinions had been, in many respects, "backed into" to attain the desired result and that they included a generous dose of 20–20 hindsight. In addition to these factors, which alone would cause the Court to discredit Coogan's opinion, his conclusion regarding the rate and angle of descent, which formed a significant part of the ba-

---

5. On cross examination, Peterson was asked to sketch the placement of the front on a map. His sketch was not consistent with his testimony, placing the front further to the west than he had described in his testimony. The

Court, however, found this demonstration, which was made under pressure, far less significant than the content and general believability of Peterson's testimony and his description of his methodology.

sis for his belief that Barna had prematurely extended the landing gear, failed to properly take into account the "winds aloft," namely the direction and strength of the wind at the altitude at which Barna was flying. Based on the Court's judgments of Coogan's credibility, the fact that David Groth, a credible witness, had confirmed in talking to Barna that he should not lower his landing gear until he could see the airport, and the other evidence in the case, the Court finds that Barna did not lower the landing gear prematurely, and accordingly, this did not speed up his rate of descent.

As noted earlier, the hill that Barna crashed into was part of a line of hills extending in an east-west direction, approximately parallel to the east-west runway at the Lone Rock airport. The tops of the trees on these hills were about 1200 feet above sea level, or about 500 feet above the airport's elevation. The hills were not shown on the NOS chart of the VOR–A approach that Barna was using. As noted earlier, plaintiff claims that NOS' failure to chart the hills was negligent.

In designing and preparing this and other similar charts, the FAA and NOS knew and intended that the charts would be relied upon by pilots in instrument flying conditions. The charts provide information regarding certain obstructions, which are shown by a "⎯＾" symbol. The Lone Rock VOR–A chart shows only one such obstruction at any point near the final approach course; it is about one nautical mile southwest of the VOR and is marked on the chart "1260±," meaning that the obstruction extends to about 1260 feet above sea level. This corresponds to a group of hills located in that area.

Barna had reviewed the VOR–A approach chart and discussed it with Groth by radio in preparing to make the approach. They discussed the 1260–foot obstruction and its location. Barna was unaware of any other obstructions along the final approach course. The line of hills that included the hill that Barna struck was further south than the 1260–foot hill,

between three and four miles south of the VOR. This line of hills began just to the west of the final approach course, indeed they were nearly as close to the approach as the 1260–foot hill that was depicted on the NOS chart. Nothing on the VOR–A approach chart told a pilot that these hills existed.

Instrument approaches are designed by the FAA, which develops approaches with the purpose of allowing an airplane to land safely during IFR, that is, when the pilot cannot see where he is going. Approaches are developed based on normal, non-emergency flight operations, not based on an emergency scenario such as that which occurred here. The FAA employs procedure specialists who are responsible for designing an approach, test flying it, and preparing a document called a Form 8260–5, which describes the approach in text. After completing the Form 8260–5, the FAA sends it to NOS (which is part of NOAA), which actually prepares the chart. The Form 8260–5 for the Lone Rock VOR–A approach did not designate the 1200–foot hills for charting.

The FAA designates for charting a "controlling obstacle" with regard to the final approach—that is, the highest obstacle connected with the final approach. The minimum descent altitude (MDA) is determined based upon the height of the controlling obstacle—in this case the 1260–foot hill. In deriving the MDA, the FAA adds a cushion to the height of the controlling obstacle because it knows that pilots may occasionally end up going below the MDA.

The FAA determines what other obstacles to chart based upon a provision of Agency Order 8260.19C, which provides guidance for the charting of obstacles on charts for instrument approach procedures. A provision of Agency Order 8260.19C specifically dealing with charting "significant obstacles" provides:

> To identify certain *significant obstacles* in or near the instrument approach area, include locations and heights under addi-

tional flight data.[6]  If, in the opinion of the procedures specialist, these obstacles could be critical to flight safety, they should be prefaced by the word "Chart."  However, if the data is being furnished only as information, it shall NOT be prefaced by the word "Chart."  Charting agencies will chart any item marked "Chart." Any item listed without indicating "Chart" will be reviewed by the charting agencies and will be charted if it meets their charting specifications. . . .

Joint Exhibit 16, p. 8–24 (Agency Order 8260.19C, § 816(e)) (emphasis in original; footnote *not* in original).

It is undisputed that the FAA procedure specialist did not include the 1200–foot hills on the Form 8260–5 for the Lone Rock VOR–A approach.  While no direct evidence was introduced regarding the procedure specialist's rationale, it is reasonable to infer that he determined that identification of the obstacles was not "critical to flight safety."  The Court declines plaintiff's request that we draw from defendant's failure to call the procedure specialist an inference that his testimony would have been unfavorable to defendant. The witness could have been deposed by either side prior to trial, and the deposition could have been introduced in evidence by either side if, as appears to be the case, the witness was outside of the Court's trial subpoena power.  *See Oxman v. WLS–TV,* 12 F.3d 652, 661 (7th Cir.1993).  In addition, there are any number of reasons why defendant might have chosen not to call the witness that are unrelated to any potential for unfavorable testimony.  *See United States v. Sblendorio,* 830 F.2d 1382, 1394 (7th Cir.1987).  For example, defendant may have concluded from Judge Bucklo's pretrial ruling that there was no need to call the procedure specialist because the FAA's work on the Form 8260–5 was likely to be deemed a non-actionable discretionary function under 28 U.S.C. § 2680(a).  In any event, the Court denies plaintiff's request to draw an inference adverse to defendant.

As noted earlier, NOS is responsible for actually preparing approach charts.  The Interagency Air Cartographic Commission (IACC), which is made up of personnel from the Departments of Transportation, Commerce, and Defense, creates guidelines for charting which are binding on NOS. With regard to obstacles, the IACC specifications state:

> Obstacles—(Man-made, Terrain, and Vegetation)
>
> (a) Any obstacle which penetrates a slope of 67:1 emanating from any point along the center line of any runway shall be considered for charting within the area shown to scale.
>
> Obstacles specifically identified by the approving authority[7] for charting shall be charted regardless of the 67:1 requirement.
>
> (b) When portrayal of several obstacles within a small area would tend to clutter the chart, only the highest need be shown.

Joint Exhibit 13, p. 11 (IACC Specifications, Chapter III, § 4.c(11)) (footnote *not* in original).  Defendant stipulated that the 1200–foot hills met the 67:1 slope requirement.  Thus, the specification required that the hills be "considered for charting."

In July 1979, NOAA / NOS issued a memorandum stating as follows:

**TO:**      OA/C422—All Employees

**FROM:**   OA/C422—Charles      T. Branch

**SUBJECT:** Trees Indicated on Procedures

Chart only "FAS Obst" trees within criteria on the chart of that procedure and no all charts of the series, unless it is the highest obstruction.

---

**6.**  "Additional flight data" refers to a section on the FAA form 8260–5.

**7.**  The "approving authority" here is the FAA.

Other non-FAS trees on the procedure will be charted on all charts of the series if they are within criteria.

This memo applies only to FAS obst identified as trees.

Another exception is when the word "Chart" prefixes the FAS obst.

Joint Exhibit 14. The memorandum's reference to "FAS Obst" is to the highest obstacle relative to the final approach segment (in this case, the 1260-foot hill with trees), i.e., the controlling obstacle. *See, e.g.,* Joint Exhibit 16 at p. 8–24 (FAA Agency Order 8260.19C, § 816(d)). The 1979 memorandum told NOS chart makers that if, as here, the controlling obstacle designated by the FAA for a procedure consisted of trees, they were to chart it (on that chart only) if the Form 8260–5 told them to do so or if it met the 67:1 slope test, and that they were to chart other trees listed on the Form 8260–5 if they met the 67:1 test. In this case, the 1200–foot hills with trees met none of these tests: they were not the controlling obstacle for this particular approach; FAA did not specifically identify them to be charted; and they were not listed on the Form 8260–5 for the VOR–A approach at all.

Because the FAA did not list the 1200–foot hills on the Form 8260–5, NOS did not include them on the chart for the VOR–A approach. Defendant's charting expert Anthony Mupo, a NOS cartographer, testified that as long as he has been with NOS, it has not charted natural obstacles that are not listed by the FAA on the Form 8260–5. There is no evidence indicating that the particular NOS chartmakers who prepared the VOR–A chart that Barna had in his airplane were actually aware of the 1200–foot hills. However, as an agency, NOS was aware of the 1200–foot hills' existence. First, the 1200–foot hills are charted on a different NOS approach chart for Lone Rock, namely the RNAV Runway 27 approach chart. This shows an approach that starts from a different location and

follows a different route than the VOR–A approach.[8] Second, at trial plaintiff introduced the actual Mylar sheet that contains the drawing used to print the NOS chart of the VOR–A approach. *See* Joint Exhibit 21. Upon close examination, the chart contains an erasure of approximately the size of a marked obstacle at exactly the point at which the 1200–foot hills would be found. This suggests that the hills were considered for charting at some point in time, though we cannot say when. (It is conceivable that the hills were charted at some earlier point in time but were removed prior to the date on which Barna's charts were prepared, but we cannot say for certain, as neither party introduced any earlier versions of the VOR–A approach chart.)

We turn next to the issue of damages. At the time of his death, Barna was twenty-six years old and was still living with his parents. He was their only child. Based upon the Court's observation of the testimony of Barna's parents, James Lee Barna and Helen Barna, as well as the testimony of Barna's former fiancee Alysa Talley, the Court finds that Barna and his parents had a special and close relationship that would have continued into the future. The relationship between Barna and his father was particularly close. Mr. Barna was instrumental in teaching his son to fly, and their mutual love for flying gave them as strong a bond as any father would wish to have with his adult son.

Barna was a devoted son who offered his parents attention, companionship, and comfort. The Barnas expected, and would have been able, to rely upon their son for the long term. Barna was very grateful for the guidance, support, and affection that his parents had given him, and the Court believes that he would have continued to reciprocate in his parents' later years, as they became less able to care for themselves. Barna's fiancee testified that

8. Flying the RNAV approach requires a type of receiver that Barna did not have on his airplane.

she and Barna planned to live in this area even after marrying, and the Court believes that Barna would have remained close to his parents, both in terms of distance and attachment.

Plaintiff offered testimony demonstrating that Barna's death had and will have a direct monetary effect on his parents with respect to the loss of his services. But there is far more to it than that. Barna was a daily part of his parents' lives. They had no other children, and his companionship and society was a focal point of their day-to-day existence. This was very important to them prior to Barna's death, and it would have become increasingly important to them as they advanced in years. In addition, the loss of their son deprived the Barnas of ever having grandchildren.

The evidence established that as of the time of trial, the Barnas' remaining life expectancies are approximately eighteen and one-half years for Mr. Barna (who is age sixty-one) and twenty-one years for Mrs. Barna (who is age sixty-two). Prior to trial, they endured six and one-half years of life without their son. In many ways, his absence may be even more damaging to them in the future than it already has been: in a parent's later years, the support and companionship of one's children can become even more important than when the parent is younger and more readily able to lead an active life. And based on life expectancies, it is likely that Mrs. Barna will survive her husband, which would have made her son's support even more critical in her final years.

## CONCLUSIONS OF LAW [9]

Plaintiff James Lee Barna is the duly appointed, qualified, and acting special administrator of the estate of James S. Barna. He has brought this action pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671–80 & 1346(b). The Court has subject matter jurisdiction under 28 U.S.C. § 1346(b). Venue is proper in this district under 28 U.S.C. § 1402(b).

Under the FTCA, the United States may be held liable for personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States acting within the scope of his employment under circumstances where the United States, if a private person, would be liable to the claimant under the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b). The "whole law" of the state where the alleged act or omission occurred governs the rights and liabilities of the parties. *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). The parties agree that Illinois law governs plaintiff's claims.

In their proposed conclusions of law, the parties agreed that the ordinary rules of negligence and due care apply to this action. Dfdt's Proposed Findings of Fact and Conclusions of Law, p. 31, ¶ 5; Pltf's Proposed Findings of Fact and Conclusions of Law, p. 28, ¶ 6. To establish a claim for negligence in Illinois, plaintiff must prove by a preponderance of the evidence that the defendant owed a duty of care, that the defendant breached that duty, and that the plaintiff suffered an injury proximately caused by the breach. *Curatola v. Village of Niles,* 154 Ill.2d 201, 207, 181 Ill.Dec. 631, 608 N.E.2d 882, 885 (1993); *Wojdyla v. City of Park Ridge,* 148 Ill.2d 417, 421, 170 Ill.Dec. 418, 592 N.E.2d 1098, 1100 (1992).

■ Air traffic controllers owe a duty of reasonable care to pilots and in an emergency are duty bound to render assistance commensurate with the risk. *See, e.g., Daley v. United States,* 792 F.2d 1081, 1085 (11th Cir.1986). At trial, the parties agreed that the duty of an air traffic controller in an emergency situation, which both sides agreed existed here, was to render "maximum assistance" to the pilot. It is reasonable to expect a controller to pay greater attention to an airplane known to be in an emergency situation. *Daley,* 792 F.2d at 1085. A controller is under an

9. This section also contains some factual find-     ings subsidiary to legal conclusions.

obligation to act when he has reason to know that an emergency situation exists, as the controllers did in this case. *United States v. Furumizo,* 381 F.2d 965, 968 (9th Cir.1967); *DeWeese v. United States,* 419 F.Supp. 147, 167–68 (D.Colo.1974), *aff'd,* 576 F.2d 802 (10th Cir.1978). When a controller is aware of a dangerous condition, his failure to act may constitute negligence. *Stork v. United States,* 430 F.2d 1104, 1108 (9th Cir.1970); *Furumizo,* 381 F.2d at 968.

■ The government also owes a duty to users of aeronautical charts to exercise due care in their design and preparation. *See, e.g., Reminga v. United States,* 631 F.2d 449, 452 (6th Cir.1980); *Medley v. United States,* 543 F.Supp. 1211, 1220–21 (N.D.Cal.1982) (government has duty to warn of hazard when government-prepared chart will lead pilots near that hazard).

At the close of plaintiff's case, defendant made a motion pursuant to Federal Rule of Civil Procedure 52(c), which provides that the court may find against a party on an issue at any point during a bench trial once the party has been fully heard on that issue. Fed.R.Civ.P. 52(c). Defendant's motion included a single argument: that the Court should deny plaintiff's chartmaking negligence claim because plaintiff had failed to present expert testimony regarding the standard of care. The Court deferred argument on this motion and reserved ruling until the close of all the evidence. After the close of the evidence, when the motion was argued, defendant added a new argument: that the Court should also deny plaintiff's air traffic controller negligence claim because of plaintiff's failure to present expert testimony regarding the standard of care as to that claim.

The Court rejects both parts of defendant's motion. First, we are not persuaded that either part of plaintiff's claim is of the type that requires expert testimony to set forth the standard of care. Under Illinois law, which governs plaintiff's claims, certain types of professional negligence claims require the plaintiff to establish the standard of care via expert testimony (with certain exceptions) on the grounds that "lay jurors are not equipped to determine what constitutes reasonable care in professional conduct without measuring the actor's conduct against that of other professionals." *Advincula v. United Blood Services,* 176 Ill.2d 1, 24, 223 Ill.Dec. 1, 678 N.E.2d 1009, 1020 (1996).

In such a case, the plaintiff must "establish the standard of care through expert witness testimony." *Id.* at 24, 223 Ill.Dec. 1, 678 N.E.2d at 1021. A plaintiff does not carry this burden "by merely presenting expert testimony which offers an opinion as to correct procedure or which suggests, without more, that the witness would have conducted himself differently than the defendant. The expert must base his opinion upon recognized standards of competency in his profession. A difference of opinion between acceptable but alternative courses of conduct is not inconsistent with the exercise of due care." *Id.*

There are at least three exceptions to the expert-witness rule. First, as explained in *Advincula* itself, if the professional's conduct is so grossly negligent or the actions performed so common that a lay person can readily appraise it, no professional expert testimony is required. *Id.* at 24, 223 Ill.Dec. 1, 678 N.E.2d at 1020. Second, "other evidence of professional standards" may sometimes suffice to establish the standard of care. *Id.* (citing Illinois Pattern Jury Instructions, Civil 3d, § 105.01); *see also, e.g., Smith v. South Shore Hospital,* 187 Ill.App.3d 847, 856, 135 Ill.Dec. 300, 543 N.E.2d 868, 872 (1989). Third, the testimony of a practitioner whose conduct is at issue may be sufficient to establish the standard of care. *Prairie v. University of Chicago Hospitals,* 298 Ill.App.3d 316, 327, 232 Ill.Dec. 520, 698 N.E.2d 611, 618–19 (1998); *Los Amigos Supermarket, Inc. v. Metropolitan Bank and Trust Co.,* 306 Ill.App.3d 115, 131, 239 Ill.Dec. 155, 713 N.E.2d 686, 697 (1999).

■ We do not believe that the standards applicable to air traffic controllers and chartmakers are so complicated that a lay fact finder is unequipped to determine what constitutes reasonable care. Defendant has offered no authority from Illinois or any other jurisdiction to suggests that a case like this is considered to be one to which the expert-witness requirement applies. The Court concludes that the expert-witness requirement does not govern plaintiff's claims.

■ Assuming, however, that the expert-witness requirement applies, the rule does not require denial of any part of plaintiff's claim. With regard to the air traffic controller negligence claim, defendant made its motion for judgment only after the close of all the evidence, which means that we may consider the evidence adduced by both sides during the defense case (including the testimony of Demes and Beaudoin), and not just that adduced in the plaintiff's case. Even if only the evidence adduced in plaintiff's case should be considered, however, plaintiff did what he needed to properly establish the standard of care under *Advincula*. The testimony of Kent Nicholson, an experienced controller called in plaintiff's case, established the standard of care applicable to air traffic controllers in situations like the one in this case, and his testimony also was sufficient to set forth at least a *prima facie* case that the air traffic controllers had negligently failed to comply with that standard. The testimony of Nicholson, one of the professionals whose conduct was challenged, was sufficient under *Advincula* for these purposes. Plaintiff also adduced evidence of the standard of care by submitting manuals and guidebooks that provide the standards under which air traffic controllers must operate.

■ With regard to the chartmaking aspects of the case, we likewise conclude that plaintiff met his burden of establishing the standard of care, though on slightly different grounds. Again, the duty of care applicable to chartmakers is not so opaque or complex that it cannot be understood by a layperson without testimony specifically establishing the standard. Moreover, plaintiff introduced the written standards that govern chartmaking by the FAA and NOS; these provide the applicable standard of care. (Indeed, when defendant introduced evidence on this aspect of the case, it consisted by and large of testimony regarding whether these standards had been breached.) Under *Advincula*, the Court concludes that this was acceptable "other evidence of professional standards," assuming that a professional standard of care had to be shown. *See generally Smith*, 187 Ill.App.3d at 856, 135 Ill.Dec. 300, 543 N.E.2d at 872.

■ We return to the elements of plaintiff's claims. After weighing the evidence, the Court concludes that the air traffic controllers in this case were negligent in providing air traffic control services to Barna in that they breached their duty of care to render assistance (whether "maximum" or "reasonable") to Barna during his emergency. Specifically, they breached their duty of care in failing to provide Barna with directions that would have allowed him to fly a shorter approach that would have given him a chance of arriving at the airport with both engines still running. Their initial refusal to provide him with such directions was negligent; then after having undertaken to provide Barna with directions, they negligently communicated the directions in an improper way, so that the directions were reasonably understood by Barna as telling him that he had to fly to full procedure turn. It was foreseeable that Barna would not understand the controllers' plan, and in fact the controllers quickly realized that Barna had not understood. But rather than trying to remedy this, the controllers negligently remained silent. They were negligent in failing to contact Barna after they observed that he was not following the course they had intended him to follow and in failing to provide him with additional directions at that point.

Because of the negligence of the controllers in failing to provide vectors to permit a shorter approach, Barna was forced to fly the full approach, and it was reasonably foreseeable that he would do so. His flying time was unnecessarily extended by the controllers' negligence, which resulted in him being forced to shut down his left engine. It was reasonably foreseeable that if Barna had to fly the full approach, he would have insufficient power to reach the airport safely and would crash. This, in fact, is what occurred. The Court concludes that Barna's crash was proximately caused by the air traffic controllers' negligence.

■ With regard to the chartmaking aspect of the case, plaintiff maintains that the failure of the FAA to designate the 1200–foot hills for charting was negligent. To determine whether this is so, we must first review the specifics of how a pilot actually lands his airplane after following the Lone Rock VOR–A approach. John Piersall, the government's expert on FAA charting procedures, agreed that every successful approach and landing, by definition, involves the pilot dropping below the MDA at some point (otherwise, of course, the pilot could not land); he said that this is permissible when, but only when, the pilot can see the runway. Piersall also conceded that the VOR–A approach to Lone Rock does not take the pilot straight to the runway. The pilot must make a circling maneuver to align the airplane with the runway before he can land. *See* diagram at p. 988 *supra*. Piersall agreed that the approach contemplates that a pilot may make a right turn from the 206 radial before reaching the airport as the first step to align himself with the runway, just as Barna did here. According to Piersall, the approach permits this, so long as the pilot can see the runway before making the turn.

The 1260–foot hill that appears on the government-prepared VOR–A chart that Barna used is outside the airport's circling area, that is, the area in which the pilot performs the maneuver to land described above. The 1200–foot hills into which Barna crashed, however, are within the circling area. In omitting the 1200–foot hills, the FAA failed to recognize this critical difference. The chart does not account for a scenario like that which may have occurred here: that the pilot flying the final approach sees the runway lights ahead of him over or through a gap in the hills, thus permitting him to drop below the MDA; upon nearing the airport and entering the circling area, turns right to begin his circling maneuver; and upon turning no longer has a clear space ahead but rather, having dropped below the MDA, is heading straight toward the 1200–foot hills. If this happens at night, the pilot will be unable to see the hills even if he can see the runway lights—the hills are not lit. In this regard, the 1200–foot hills are not only "critical to flight safety," they are *more* critical to flight safety than the 1260–foot hill, which is outside the circling area and thus does not come into play during a pilot's final circling maneuver. The FAA's failure to designate the 1200–foot hills for charting thus created an objectively unreasonable risk of a crash. The Court concludes that plaintiff has demonstrated that the FAA was negligent in failing to designate the 1200–foot hills for charting.

Plaintiff cannot, however, recover for this negligence. Defendant has argued that the "discretionary function" exception found in 28 U.S.C. § 2680(a) bars plaintiff's chartmaking claim. This exception bars a claim against the United States for an act that involve an element of judgment or choice, so long as the judgment is of the kind that the exception was designed to shield, namely that it was grounded in social, economic, or political policy. *See, e.g., United States v. Gaubert,* 499 U.S. 315, 322–23, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). Both parts of this test have been met here. Though charting the 1200–foot hills was critical to flight safety, the FAA's function of making that determination involved the exercise of discretion or judgment. The FAA's criteria did not mandate the charting of hills but rather

required the procedure specialist to weigh and balance competing considerations of safety, clarity, and comprehensibility. The FAA's determination not to chart the hills, though negligent, was a non-actionable discretionary function.

■ From plaintiff's perspective, however, there is more to the chartmaking aspect of the case than the FAA's performance of its functions. NOS is the agency that actually prepares the approach charts for the government. Plaintiff argues that NOS performs a function separate from that of the FAA in the chart preparation process and in this instance performed it negligently. And according to plaintiff, NOS's negligence did not involve the exercise of a discretionary function.

There was a great deal of discussion at trial about the NOS memorandum prepared in 1979 by Charles Branch (Joint Exhibit 4, quoted earlier) and still followed today, which sets standards regarding when NOS will chart trees that the FAA has listed on a Form 8260–5. In determining whether NOS was negligent, however, this memorandum has little relevance, for the 1200–foot hills were not listed by the FAA on the Form 8260–5 for the Lone Rock VOR–A approach.[10]

What is relevant, plaintiff argues, are the IACC standards, which require NOS not merely to chart those obstacles designated by the FAA, but also to "consider for charting" *any* obstacle penetrating a slope of 67:1 within a particular area near an approach. As noted earlier, the parties stipulated that the 1200–foot hills met the 67:1 criterion; thus the IACC standard required NOS to consider them for charting.

There is no evidence that directly indicates that NOS itself considered the 1200–foot hills in preparing the chart. Indeed, the testimony of government charting expert Anthony Mupo suggests that NOS would not have considered them at all. According to Mupo, NOS does not consider trees that are not listed by the FAA on a Form 8260–5, and in this case the obstacle was not listed by the FAA. On the other hand, the erasure from the Mylar discussed earlier indicates that NOS may in fact have considered the trees for charting at some earlier point, if only to determine that they should not be charted or should be removed from the chart. However, as previously noted, neither side introduced any evidence that would illuminate this point any further.

Under the circumstances, we have little difficulty concluding that in preparing the chart that Barna actually used, NOS failed to consider the trees for charting and thus violated the IACC specification. The duty to consider the trees is phrased as a mandatory and not a discretionary function, so 28 U.S.C. § 2680(a) does not apply. *See, e.g., Grammatico v. United States,* 109 F.3d 1198, 1200 (7th Cir.1997) (to overcome discretionary function exception, plaintiff must show that government violated policy which specifically prescribes a course of action to follow).

The discretionary function exception, however, is just one of several hurdles that plaintiff must clear. Plaintiff must also demonstrate that NOS's failure to consider the trees was negligent and that this proxi-

---

**10.** The evidence indicates that if the FAA *had* listed the 1200–foot hills on the Form 8260–5, NOS would have charted them. The Charles Branch memorandum states that NOS will chart trees other than the controlling obstacle if they meet the 67:1 criterion, which this obstacle did. The IACC specifications say that if charting several obstacles within a small area would clutter a chart, lower obstacles need not be shown, but it does not appear that charting the 1200–foot hills would have caused clutter—as demonstrated by the Jeppesen chart, which included a single reference to the 1200–foot hills, as well as the 1260–foot hill, and which clearly was not "cluttered." *See* Joint Exhibit 10. This analysis makes it apparent that what actually caused the non-charting of these particular obstacles was not the Branch memorandum, but rather NOS's decision to follow a policy or practice of not considering trees that the FAA has not listed, as discussed more fully in the text.

mately caused Barna's death. The Court concludes that plaintiff has failed to make that showing. Indeed, NOS's failure to *consider* the 1200–foot hills for charting is not truly what is claimed to have caused Barna's crash. Rather, what is claimed to have caused the crash is the failure to actually chart the hills.

As noted above, the evidence showed that NOS does not chart obstacles that are not listed on the FAA's Form 8260–5. By deciding to follow such a practice, NOS essentially delegated to the FAA the responsibility of "considering" trees for charting. We conclude that this practice did not violate a duty of ordinary care. NOS could reasonably determine that the FAA, which actually test-flies approach procedures, is in a better position than NOS to determine whether flight safety considerations require a particular natural obstacle to be charted. NOS's determination not to recheck the FAA's work did not constitute negligence.

Whether or not this is so, our determination that what actually caused the non-charting of the hills was not NOS's violation of its duty to consider this particular obstacle, but rather its decision to rely upon the FAA, brings us full circle back to the discretionary function exception. NOS's decision to rely on the FAA to determine the universe of hills to be considered for charting, is, we believe, a discretionary policymaking determination that is non-actionable under 28 U.S.C. § 2680(a). No regulation or rule mandates that NOS must have its own personnel make the requisite consideration or bars NOS from deferring to another agency to perform this function. And the decision to delegate this task to an agency arguably better equipped to make the necessary determination is a policymaking determination of the type that the discretionary function exception is designed to shield. Thus for this additional reason, plaintiff cannot succeed on his chartmaking claim.

Our conclusion that plaintiff's chartmaking claim has failed, however, does not affect the ultimate outcome of the case. As discussed earlier, the crash of Barna's plane was a foreseeable result of, and was proximately caused by, the negligence of the air traffic controllers.

We turn next to the issue of comparative negligence. Defendant claims that Barna's own negligence caused or contributed to the crash. Illinois has a comparative negligence law under which the fault, if any, chargeable to the plaintiff is compared with the fault of all tortfeasors whose fault was a proximate cause of the damage for which recovery is sought. Damages are diminished in proportion to the amount of fault attributable to the plaintiff, unless the plaintiff's fault is more than 50% of the proximate cause of the damage, in which case the plaintiff is barred from recovering. 735 ILCS 5/2–1116.

■ To show that Barna was contributorily negligent, defendant must prove by a preponderance of the evidence that Barna failed to exercise ordinary care for his own safety and that his failure to exercise ordinary care was a proximate cause of his injury. *See, e.g., Savage v. Martin,* 256 Ill.App.3d 272, 195 Ill.Dec. 142, 628 N.E.2d 606, 613 (1993); *see* Illinois Pattern Jury Instructions—Civil, § B10.03 (1995).

The Federal Aviation Regulations, which have the force of law, provide that the pilot in command is the final authority as to the operation of his aircraft. 14 C.F.R. § 91.3(a). These regulations also provide that in an in-flight emergency requiring immediate action, the pilot may deviate from any regulation to the extent required to meet the emergency. 14 C.F.R. § 91.3(b). Presumably this includes the right to deviate from any direction given by an air traffic controller to the extent necessary to meet an emergency.

■ Defendant maintains that even if Barna misunderstood the controllers as telling him that he had to fly the full approach, he was not only authorized under these regulations to disregard their

directions, he was duty-bound to do so. It argues that if a controller issues a direction that in the pilot's judgment would jeopardize the safety of the aircraft, the pilot has a duty to reject the direction, tell the controller, and request a new direction. *See generally In re Air Crash at Dallas/Fort Worth Airport on August 2, 1985 (Connors v. United States),* 720 F.Supp. 1258, 1290 (N.D.Tex.1989); *Pan American World Airways, Inc. v. Port Authority of New York and New Jersey,* 787 F.Supp. 312, 318 (E.D.N.Y.1992).

Defendant has not met its burden of proving Barna negligent in this regard. Defendant's argument boils down to the proposition that the actions of an air traffic controller in directing a pilot, no matter how wrong they are, make no difference because the pilot, being in a position of final authority, will always be negligent if he follows the controller's improper directions. Taken to its logical conclusion, this would lead to chaos in the skies; pilots would not be able to rely on what air traffic controllers told them. We decline to read the FAA regulations in this manner. *See, e.g., Foss v. United States,* 623 F.2d 104, 106 (9th Cir.1980); *DeWeese v. United States,* 419 F.Supp. 147, 168 (D.Colo.1974), *aff'd,* 576 F.2d 802 (10th Cir. 1978).

Even were we to adopt the government's reading of the regulations, we would still be required to determine whether Barna's claimed non-compliance with his obligation of "final authority" constituted negligence—in other words that flying the full approach violated Barna's duty of ordinary care. It did not. The controllers had effectively told Barna *more than once* that he could not have the directions he sought and would have to follow the published approach, including the full procedure turn. Barna was operating in an unfamiliar area, at night, in weather conditions that required him to fly by instruments, and he did not know what other risks might lie in the area if he deviated from the controllers' directions and the published approach—either from other aircraft, outlying obstacles, the risk that he would lose radio contact, or some other factor. It was reasonable and prudent for Barna to follow the instructions given to him by the air traffic controllers, who *were* able to see the big picture. The VOR–A approach course was mapped out, and Barna knew that he could follow it even if he lost contact with the controllers. It was not negligent for him to fly the full approach after the controllers (he believed) had told him to do so. While the Court recognizes that a direction by an air traffic controller does not relieve a pilot of the responsibility to operate his aircraft consistent with the Federal Aviation Regulations and good operating practices, we find that Barna complied with these standards and that his failure to reject the controllers' direction was not negligent.

Defendant also contends that Barna was negligent in several other respects. First, defendant argues that after learning that he had a problem with his left engine, Barna should have shut that engine down so that he could evaluate the performance of the airplane on a single engine. Having made that evaluation, Barna could have restarted the left engine and continued to fly on two engines. According to defendant, if Barna had done this, he would have realized that the airplane would lose altitude when flying on a single engine. However, the evidence showed, and the Court finds, that restarting the left engine after shutting it down would have posed a serious risk of a fire or other damage to the engine. Moreover, it is anything but a foregone conclusion that Barna would have been able to restart the engine. Barna believed, and reasonably so, that it was more prudent to keep the engine running as long as possible. Defendant failed to demonstrate that this constituted negligence on Barna's part.

Defendant also argues that Barna was negligent in flying to Lone Rock rather than to another airport, such as Mineral Point or Madison. Yet Barna's request for the closest airport was a reasonable and prudent means of dealing with his emer-

gency situation, and as we have already found, Barna did not have the equipment necessary to land at Mineral Point. While it is true that there were no current weather reports for Lone Rock, there was no guarantee that Barna would be able to make it to a weather-reporting airport such as Madison, which would have required him to fly even further than Lone Rock. Moreover, as we have found, the weather at Lone Rock was not such as to prevent Barna from seeing the airport runway. In sum, nothing about Barna's request for or choice of airports was negligent.

Defendant next contends that Barna gave up altitude unnecessarily and that he should not have descended to 3300 feet, and then to 3000 feet and below, as soon as he did. Once the left engine had to be shut down, Barna could no longer maintain altitude; defendant argues that if he had remained at a higher altitude when flying the approach, he would have had more altitude to "give up" and might have cleared the hills. The primary problem with this argument is that it fails to take into account the weather conditions in the area. One way or another, Barna had to come down in altitude at some point in order to be able to see the airport; without seeing the airport he would be unable to land. The cloud ceiling was at a level such that if Barna had flown the approach at a higher altitude, as defendant proposes, he would have had to descend precipitously near the end of the approach in order to drop out of the clouds to be able to see the Lone Rock runway. Barna had a general idea of the likely level of the ceiling from the report that Demes had given him about Madison weather; thus he knew that he would have to come down to near the MDA in order to have a chance to see the airport. That being the case, it was reasonable and prudent for him to conduct a gradual descent over the entire course of the approach. Demes gave Barna clearance to descend to 3300 feet and later gave him a clearance to descend further once he was established on the approach. Barna remained at or above the prescribed altitudes as long as he was able to do so.

Defendant argues that Barna turned off or stopped listening to the air traffic control frequency. We have found to the contrary. Barna continued to listen to that frequency. As we have found, if the air traffic controllers had met their duty of ordinary care and maintained or reestablished communications with Barna, the crash would have been prevented.

Defendant also contends that Barna made an unnecessarily wide and extended procedure turn. Based on the findings we have previously made, including the fact that Barna reasonably understood Demes to have told him that he had to fly the "full procedure turn," and the other reasons we have discussed that counseled Barna to stick to the published approach route, his conduct, which followed the course that the controllers had directed him to follow, was reasonable and prudent and was not negligent.

Finally, defendant argues that Barna lowered his landing gear prematurely and that this caused him to lose altitude near the end of his flight. We have already found, however, that Barna lowered his gear only in the final seconds of his flight, in the hope of cushioning his impact with the hill.

For these reasons, the Court finds and concludes that defendant failed to demonstrate that Barna was contributorily negligent.

We turn finally to the issue of damages. Under Illinois law, an action for wrongful death must be brought by and in the name of the personal representative of the deceased. The amount recovered is for the benefit of the surviving next of kin of the deceased. The trier of fact is to award such damages as will provide fair and just compensation for the "pecuniary injuries" resulting from the death to the surviving next of kin. 740 ILCS 180/2. Where the deceased is an adult child, the surviving parents may recover the value

that the child's money, goods, society, companionship, and services might have been expected to contributed to the parents if the child had lived. *See, e.g., Ballweg v. City of Springfield,* 114 Ill.2d 107, 102 Ill.Dec. 360, 499 N.E.2d 1373 (1986). "When children are wrongfully killed, the parents' investment of money and in affection, guidance, security and love is destroyed. Society recognizes the destruction of that value, whether the child is a minor or an adult." *Id.* at 120, 102 Ill.Dec. 360, 499 N.E.2d at 1379.

Based on the life expectancy statistics introduced in evidence, the Barnas are likely to be deprived of their son's support, advice, affection, society, care, and companionship, as well as of the services that he would be able to provide or purchase for them, for a very substantial period of time. James Barna was his parents' only child, making the loss all the more significant; the Barnas have no other children that they will be able to rely upon as they advance in years. They will also be deprived of the joy of seeing and caring for grandchildren. Based upon the Court's evaluation of the evidence, and its consideration of the arguments of the parties, the Court awards damages to the plaintiff in the following amounts: $500,000 to compensate for the loss to Mr. Barna, and $550,000 for the loss to Mrs. Barna, plus funeral expenses of $9,390.45, for a total of $1,059,390.45.

## CONCLUSION

For the reasons stated above, judgment will enter in favor of plaintiff and against defendant in the amount of $1,059,390.45. Plaintiff is directed to file his bill of costs within 30 days in conformity with Local Rule 54.1.